STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RALPH COOPER AND COLLIS ENGLISH, DEFENDANTS-APPELLANTS, AND McKINLEY FORREST, JOHN MacKENZIE, JAMES H. THORPE AND HORACE WILSON, DEFENDANTS.

Argued October 20, 1952—Decided November 24, 1952.

538

*Mr. George Pellettieri* and *Mr. Arthur Garfield Hays* argued the cause for appellants.

*Mr. Mario H. Volpe,* Mercer County Prosecutor, argued the cause for the State (*Mr. Frank H. Lawton,* First Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

WACHENFELD, J. Six men in 1948 were indicted and convicted of murder in the first degree. They were sentenced to death. It was a long and difficult trial lasting 44 days.

On appeal, this court reversed the judgment rendered against them because of errors committed in the trial. *State v. Cooper*, 2 *N. J.* 540 (1949).

On the retrial ordered, four of the defendants were acquitted by the jury and two, Cooper and English, were convicted of murder in the first degree and sentenced to life imprisonment in accordance with the jury's recommendation.

In their appeal, presently before us, they seek to set aside the judgment, contending: (1) a verdict should have been directed in their favor as there was no legal evidence from which an inference of guilt could be drawn, nor was there proof of robbery or attempted robbery or of conspiracy; (2) the admission of the defendants' confessions violated their constitutional rights; (3) the verdict was against the weight of the evidence; and there was error (4) in admitting into evidence unsigned, unacknowledged notes taken by a police officer from a conversation with one of the defendants; (5) in the prosecutor's attempts to attack the credibility of two witnesses by showing prior convictions of crime; (6) in admitting into evidence a soda bottle and a bottleneck, S-40 and S-44; (7) in admitting into evidence a coat, bottle and sock found by George English, and a photograph; (8) in neutralizing the testimony of Dr. Sullivan on the ground of surprise; (9) in rejecting the defense testimony relating to the temper of the community; (10) in sustaining objections to all questions on cross-examination of the State's witnesses designed to establish over-zealousness and *animus* of the police in reference to their efforts as to the confessions; (11) in restricting the cross-examination of State's witness Miller; (12) in restricting the cross-examination of State's witness Toft; (13) in denying certain requests to charge; (14) because the verdict was inconsistent with the evidence presented because the alleged principal was acquitted.

Each point advanced will be dealt with in order of its presentation.

## FACTS

William Horner and his reputed wife, Elizabeth McGuire, generally known in the community and referred to at the trial as Mrs. Horner, conducted a second-hand furniture store at 213 North Broad Street, Trenton. On the morning of January 27, 1948 he was murdered with a blunt instrument and she was seriously injured by an assault hereinafter described.

The first floor of the establishment consisted of two rooms, both stacked high with old household furnishings, appliances and accessories. Each extended the full width of the shop and the floor of the rear room was a step lower than that of the front.

Mrs. Horner testified on the morning in question, about 10:30, three colored men entered the store (whom she subsequently identified as the defendant English and his co-defendants Forrest and Wilson, who were acquitted on the retrial); English and Forrest proceeded to the rear room where Horner was, while Wilson asked her about a second-hand stove; she was engaged in showing it to him when she received a severe blow on her head and another on her face; she was stunned and rendered partially unconscious, her next recollection being of standing at the front door calling for help.

She was taken to a hospital where several stitches were required by the lacerations about the head, and it was ascertained she had sustained fractures of her ribs and cheekbone. The medical testimony indicated a severe swelling of her entire face and edema of the conjunctiva and eyelids to such an extent her eyes were completely closed at the time of an ophthalmological examination four days later. This condition had, however, largely subsided by the time of her discharge from the hospital on February 5.

A passerby, one Frank Eldracher, saw Mrs. Horner, her face bloodied, open the door of the furniture store and heard her begin to scream. He ran to the corner and notified a

police officer who proceeded to the scene, spoke briefly to Mrs. Horner, discovered Horner lying unconscious on a mattress in the back room and turned in the alarm. An ambulance was summoned and Horner taken to Mercer Hospital, where he died that afternoon of a compound, comminuted fracture of the skull which, according to the autopsy surgeon, was caused by a blunt instrument and could have been inflicted by a bottle such as that admitted in evidence as Exhibit S-40, described and discussed below.

Police officers inspecting the premises found a full bottle of soda water in the back room and the neck of a bottle of similar make in the front. Both were covered with fragmentary ridges and smears of fingerprints but, in the opinion of the police expert who examined them, these traces were not sufficiently clear and complete to be of any value either to identify the person or persons who made them or to eliminate a possible suspect.

On February 6 a policeman went to the home of George English, father of the accused, in response to a complaint that the son was using the father's car for his own purposes without permission. Pursuant to this complaint Collis English was picked up at his mother's house, where he lived, and taken to the precinct for questioning.

During the interrogation English was queried about possible participation in the events of January 27 at the Horner store. At first he denied all knowledge, but later admitted he had driven to the vicinity with the defendant Cooper in the car belonging to his own father. There, at Cooper's request, he had gone into a nearby jewelry store to inquire about a watch of Cooper's. The jeweler denied having it and English emerged to the sidewalk in time to see Cooper and two other colored men run out of the second-hand store and drive off in the car, one of them having what appeared to be blood on his shirt. The officer took longhand notes on this statement, which is the subject of more detailed discussion hereafter.

Early the following morning, on information from English, the police arrested the defendants Cooper and Wilson. On the same day the defendant Forrest arrived at the police station to inquire about English and was also detained. Shortly thereafter the other two defendants, MacKenzie and Thorpe, who had been implicated by stories given the police by English and Cooper, were apprehended.

On February 7 Mrs. Horner was taken to the police station and was shown three or four of the accused, including English and Cooper, but was unable to identify any of them as her assailants.

Between the time of their arrest and February 11 all of the accused except Wilson made statements, some in their own handwriting and some in formal question and answer form typed and signed, admitting some part in a planned robbery of and assault upon the Horners. Only two of these statements, one by each of the present appellants, were admitted in evidence under circumstances which will be discussed later. On February 11 all six accused were arraigned.

The second trial was protracted, complicated and lengthy, consuming almost 15 weeks in time. There were many exhibits and more than 140 witnesses were heard. Many conflicts in the evidence occurred and the testimony frequently clashed. It resulted in the acquittal of all except English and Cooper, who were again convicted and sentenced to life imprisonment. On this appeal they assert the 14 grounds for reversing the judgment already specified.

I.

The first error cited is the trial court's refusal to direct a judgment of acquittal on the defendants' motion at the end of the State's case and again at the completion of the entire case. These motions were predicated on the alleged failure of the State to prove the killing occurred during the course of a robbery or attempted robbery and that there was any unlawful combination or conspiracy among the

defendants and no legal evidence before the jury from which an inference of guilt could properly be drawn.

Mrs. Horner, the appellants stress, immediately after the crime described her assailants as being "light colored" and was unable to identify any of the men shown to her at the police station on February 7 which group supposedly included both English and Cooper. They, it appears from the record, are of very dark complexion.

She also testified only three persons were in the store at the time the crime was committed and that Cooper, whom she knew from a previous occasion, was not one of these. The State's theory was that five of the accused entered the store while the sixth remained on the sidewalk as a look-out. There is evidence showing while Mrs. Horner was exhibiting the stove immediately before she was struck, she was at the rear of the front room, which was piled high with old furniture and kindred miscellany, and so would not have been in a position to see two others who might have entered the store after the arrival of the first three but before the crime was committed.

It is suggested Mrs. Horner first reported she had been struck with brass knuckles whereas, according to the State's theory, the soda bottles found in the store soon after the crime were the weapons used.

At the time she was assaulted Mrs. Horner was bending over the stove to open the grate and was hit from behind. As she lifted her head she was hit again on the side of her face, suffered serious injuries and thereafter apparently has little recollection of what occurred. It would be difficult for her, under the circumstances, to know what had hit her, and the mention of brass knuckles is simply another minor instance of conflict in the evidence to be considered by the jury in making its determination.

There were other discrepancies in the accounts by the various witnesses of the stature, coloration and clothing of the persons seen in or near the store at about the time of the crime. Mrs. Horner described the shortest of the men as

being young-looking and wearing a tan slouch hat, tan overcoat and silver-rimmed glasses. English was the shortest of the six accused and was not proved ever to have worn glasses. He was, moreover, charged at the trial with having been dressed in a peaked jockey cap, a tan worksuit and army leggings. However, Mrs. Horner saw only three men in the store but was admittedly in a position, immediately before the assault upon her, where she could not command a view of the whole front room. While her testimony in this respect in no way connects English with the crime nor carries any weight in establishing his presence in the store at the time, neither does it tend to rule out the possibility of his having been present nor serve to refute other testimony, including his own subsequent statement, tending to establish his presence and participation.

The State's witness, Eldracher, described two men whom he saw coming out of the store as being "light complected, not overly dark," and said the shorter one was the lighter and the taller a little darker. He testified the men walked north on Broad Street and he did not see them cross the street nor hear a car leaving the area. Immediately thereafter his attention was distracted when Mrs. Horner, her face bloodied, appeared at the door of the shop and began to cry for help and he went immediately in search of a policeman.

The State's theory was the killing occurred during an attempted robbery in which both appellants had participated. The defense vigorously points out the State did not claim or attempt to prove that either English or Cooper struck the fatal blow, and it is urged there is no proof either of robbery or an attempt to commit the offense and thus the crime cannot be designated first degree murder as a homicide occurring in the course of a felony. The appellants' brief sets forth its objection thusly:

"The evidence produced by the State was conflicting, confusing, irresponsible, contradictory. It was not sufficient in character or quality to overcome the presumption of innocence. It is not such

evidence as can be asked to support a conviction of murder. * * * Outside of the confession of English, there was no proof of any robbery or attempted robbery and there was no corroboration even of English's confession on this point."

We entertain no difficulty in reaching an opposite conclusion. It is not necessary that English's confession or Cooper's holographic statement be corroborated by external evidence in every respect.

"The only limitation upon the use as evidence against him of a prisoner's confession of murder, voluntarily made, is the want of proof of the *corpus delicti*. If death, through criminal agency, be proved, and a man confesses to having caused that death, he may be convicted of murder on his confession." *State v. Kwiatkowski,* 83 *N. J. L.* 650 (*E. & A.* 1912).

The same rule was enunciated in *State v. Banusik,* 84 *N. J. L.* 640 (*E. & A.* 1906), the court saying:

"Full proof of the body of the crime, the *corpus delicti,* independently of the confession, is not required."

This rule was again affirmed in *State v. James,* 96 *N. J. L.* 132 (*E. & A.* 1921), where the court observed:

"The law does not require full proof of the body of the crime independent of such confession."

This rule still prevails, as indicated by the holding in *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1948), where, on facts somewhat approximating those presently encountered, the court again adhered to the rule of the *Kwiatkowski* case, *supra,* saying:

"The law of this state is settled that if death, through a criminal agency, be proved, and a man confesses to having caused the death, such proof will support a conviction of murder."

As to Collis English, the defense points to testimony of members of his family and neighbors that he was engaged at the time of the crime in assisting his mother with the

family wash. It attempts to discredit his confession by pointing out a cardiac condition which had existed for some time and was noted on his army records when he was discharged from the service. The effort is to show not that English was in any way physically abused while in the custody of the police before making his statement but that mental pressure induced by the fact of arrest and accusation and the imposing presence of the police officers combined with his own lack of education and physical weakness to produce a state of fear and an ultimate resignation to co-operate in supplying whatever statement the authorities desired in order to assure his own good treatment at their hands.

This argument overlooks the fact there is much external evidence corroborating English's confession. In the statement he described a meeting of five persons, including Cooper and himself, which took place on the day prior to the crime, admitting plans were made to rob the store "and see who was to do what and where they would take their positions." It was agreed "tomorrow would be a good day because business would be slow."

The confession goes on to say that the following morning Cooper met him at Perry and Broad Streets and they drove on to pick up McKinley, Thorpe and Wilson. On the way to the furniture store they stopped at the New Life Lunch at Perry and Broad Streets, where they purchased soda bottles. He continues to narrate: "Wilson said we would use the bottles like a gun. McKinley said they were too big to look like guns and Wilson said, 'What's the difference?' "

They proceeded to the store, parking the car nearby, and all went in. English says he saw one of the other men strike Horner on the head with a bottle and the victim fell toward a mattress on the floor. He was told by Wilson "to go in his pockets and to hurry up about it. I was kind of shaky and when he seen how shaky I was Wilson said: 'Get out of here. You're too damn slow.' While I was in his pockets I got a few dollars out of his pockets." The statement goes

on to identify the pocket from which the money was extracted as the right-hand pocket.

Various parts of this statement are corroborated by the testimony of other witnesses and by other evidence. For instance, one of the victims, Mrs. Horner, identified English at the trial as being a member of the group present in the store when the assault took place. She had been unable to do so at the police station two days after her discharge from the hospital, but there is evidence she was still suffering then from some impairment of vision as a result of the blows she had received.

The proprietress of the New Life Restaurant at Perry and Broad Streets testified that about ten o'clock on the morning of January 27, 1948 she sold two bottles of a beverage called "Step-up" to two colored men who took the bottles with them from the store. The bottles were colored brown and green. The full soda bottle found at the scene of the crime was a green bottle of Step-up and the bottleneck which still had the cap on it was a brown bottle of Step-up.

There is additional corroboration in the fact English in his confession correctly described the position of Horner after the assault. He said Horner was sprawled across a mattress on the floor in the back room of the shop. That is the position in which he was found by the police officer summoned by Eldracher.

English recounts taking some money from the right-hand pocket of Horner. There is testimony of police officers to the effect as examination of Horner's clothes made after his arrival at the hospital showed various sums in other pockets, but there is no record of money having been found in the right-hand trouser pocket.

The appellants attempt to refute the State's theory of robbery or attempted robbery by pointing out cash in the amount of more than $1,600 was found in Horner's pockets by the police, and Mrs. Horner testified she had $900 on her person which was not taken from her. This, it is

asserted, negatives English's statement he took "a few dollars" from the right-hand pocket of the decedent. ·

The evidence does not warrant this conclusion. It is understandable that after such an assault the perpetrators would be under mental compulsion not to tarry unduly at the scene, particularly when the possibility was ever present that the stunned victims might recover consciousness and give the alarm. Under such circumstances it is entirely conceivable that a search for money or other valuables might be confined to the one pocket where the assailants thought them most likely to be when no further time existed for both detailed exploration and safety by way of escape.

The defense asserts there is no evidence to connect Cooper with the crime. They point out Mrs. Horner's testimony that she knew Cooper from a previous visit and he was not present in the store when the assault was committed. As has already been described, Mrs. Horner was bending over a stove in the rear of the front room when the attack upon her was made and in that position she did not command a full view of the store. Cooper's holographic statement admits his presence at the time and place of the crime and he describes in detail the attack upon the proprietors, the method of its execution and the weapons used.

There is further corroboration of Cooper's statement in the testimony of George English, father of the co-appellant, that on January 9th, while he was engaged in cleaning the furnace in the basement of his house, he overheard a conversation between Cooper and the witness' stepdaughter in which the defendant sought the help of his companion in borrowing the witness' car because "he had some robbing to do up on Broad Street * * * at a second-hand furniture store."

The defense urges much of this testimony is considerably impaired by the cross-examination of the witness, showing prejudice, bias, a criminal record and improbability. The weight and credence to be accorded it are nevertheless for the jury.

Cooper in his own written statement confessed to being on the scene of the crime, although he denied participation in the assaults or knowledge of the criminal purpose of the visit. He admits having accompanied the others in the car, and the details he gives as to time and place of the meeting with English, the drive to the store, the mode of assault and the use of a bottle or bottles as the weapons are identical in almost every respect with the information supplied by English in his separate confession.

His statement, also, places Horner in the back room of the store while Mrs. Horner was in the front room when the assaults were made upon them. These facts, as has been shown, are corroborated by Mrs. Horner in her testimony and by the position in which Horner was found.

It is true both English and Cooper on the stand professed complete innocence and denied having been present when the crime took place, basing their defense on alibis. Their statements to the contrary, however, separately taken, coincide with the proven physical facts, the testimony of other witnesses and the objective evidence.

■ The real question before the trial court at the completion of the case was whether the evidence, viewed in its entirety, was such that the jury could properly find therefrom beyond reasonable doubt that the defendants had committed the crime charged against them. *State v. Goodman,* 9 *N. J.* 569 (1952).

In *State v. Catania,* 102 *N. J. L.* 569 (*Sup. Ct.* 1926), a motion for direction of a verdict of acquittal was made at the completion of the case and was denied. The appellate court upheld the action of the trial court quoting the language of *State v. Morehous,* 97 *N. J. L.* 285 (*E. & A.* 1921), saying:

"If there was testimony supporting the charge laid in the indictment, then the question of the defendant's guilt or innocence became one for the determination of the jury and not the court."

In the case before us there is evidence in the record supporting the indictment and it thus became the jury's obligation, in accordance with the judge's charge, to determine the guilt or innocence of the appellants after considering all the evidence and forming its own opinion as to the credibility of the witnesses and the weight to be accorded the testimony. We see no error in the refusal of the trial court to direct a verdict of acquittal.

## II.

Having determined there was sufficient corroborative evidence which, combined with the appellants' statements, created an issue for the jury on the question of guilt or innocence, we are next confronted with the contention the confessions themselves were inadmissible and their reception in evidence was a violation of the constitutional rights of the accused.

The test of the admissibility of a statement of a defendant, made while he is in custody, which is otherwise relevant to the issues being tried, is whether or not it is voluntary. *Roesel v. State*, 62 *N. J. L.* 216 (*E. & A.* 1898); *State v. Young*, 67 *N. J. L.* 223 (*E. & A.* 1902); *State v. Pierce*, 4 *N. J.* 252 (1950); *State v. Bunk*, 4 *N. J.* 461 (1950).

Whether a statement or confession is, in fact, voluntary depends on the facts of the individual case and the determination of the trial court will not be disturbed on appeal where the evidence is adequate to sustain it. *State v. Cole, supra; State v. Pierce, supra.*

It is asserted the confession of English should not have been received because he was poorly educated, mentally slow and physically weakened by a chronic cardiac murmur; and the interrogation by police officers over a period of five days placed him under great "pressure" and caused him to become "frightened." This fear, it is alleged, induced the confession and, concurrently, destroyed its voluntary char-

acter. Much the same argument, except for the cardiac condition, is advanced against the admission of Cooper's holographic statement.

English was questioned for several hours on the day of his arrest. He was, however, allowed frequent respites for rest and meals during this time. That night and early the following morning he accompanied the police on two trips to a nearby town to check on the alibi he advanced.

Sleep may have been limited the first night but on the following day he was questioned only two or three times for a few minutes on each occasion, with long intervals of rest in between.

On the third day there was a total of about five to five and a half hours of interrogation with a rest interval of approximately five hours between the sessions, and during the ensuing two days before making his confession the questioning periods were few, brief and widely separated in time.

The evidence, including the testimony of the defendants, shows Cooper underwent even fewer and shorter interrogations.

There is nothing in the record to indicate the accused were subjected to physical discomfort, mistreatment or inconvenience, or deprived of clothing, food or rest, conditions that were alleged and proved in *Watts v. Indiana,* 338 *U. S.* 49, 69 *S. Ct.* 1347, 93 *L. Ed.* 1801 (1949); *Turner v. Pennsylvania,* 338 *U. S.* 62, 69 *S. Ct.* 1352, 93 *L. Ed.* 1810 (1949); and *Harris v. South Carolina,* 338 *U. S.* 68, 69 *S. Ct.* 1354, 93 *L. Ed.* 1815 (1949), cited in their brief, and in the other cases collected and discussed in *State v. Pierce, supra.*

Persons detained and questioned in connection with a serious crime generally exhibit some nervousness and even fear. An experience so foreign to the normal routine of daily life cannot but evoke a measure of apprehension or, in the appellants' phrase, "pressure."

This sense of fearfulness is naturally heightened in a guilty person so detained and questioned, but such normal

emotional disturbances will not impair the voluntary quality of a subsequent confession.

The state of mind which renders such a statement involuntary and hence inadmissible is that induced by mistreatment, threats, promises, physical or mental abuse which deprives an otherwise rational mind of the exercise of its free will and powers of decision and discernment. It is not that mental condition which arises from an inner sense of wrongdoing and fear of its consequences. As said in *State v. Pierce, supra*:

"The fear that arises out of a consciousness of guilt and a dread of the legal penalty which probably will and ought to fall is not the kind that will invalidate an otherwise voluntary confession."

The record before us is devoid of any showing of maltreatment or of physical or mental hardship imposed on these defendants. After signing their statements they were examined by two doctors, one a member of their own race chosen so as to overcome any barrier of timidity or reticence which might otherwise have prevented their speaking freely. In response to questioning they did not complain of the conditions of their detainment or of the circumstances under which the statements were taken. Rather, they affirmed the truth of their contents.

The appellants briefly observe, without stressing it, "that Cooper had at no time been cautioned," presumably of his right to remain silent. Such cautionary instructions are not an essential step in the establishment of the fact that a confession is voluntary. *State v. Hernia*, 68 *N. J. L.* 299 (*E. & A.* 1902); *State v. Cole, supra; State v. Pierce, supra*.

We note, although the point is not specifically raised by the State, that *Rule* 2:3–3, requiring an accused be arraigned before the nearest magistrate without unnecessary delay, was not in effect in February 1948 when these defendants were arrested. Even had it been, the five-day

delay in arraignment, under the circumstances here proven, would not in itself, invalidate the statements.

"Whenever there has been any undue delay in taking an arrested person before a magistrate, in violation of our rule, careful scrutiny will be given to the conditions under which a statement was taken from him during the period of delay and such a statement will be admitted in evidence only when it convincingly appears that it was in fact and in truth voluntarily made." *State v. Pierce, supra.*

Regardless of the effective date of the procedural rule, we have given careful scrutiny to the conditions under which these statements were made, as revealed by the voluminous pertinent testimony received by the court, in the absence of the jury, over a period of nearly three weeks and the other evidence in the case.

Our study of the entire record satisfies us these statements were voluntarily made and discloses no circumstance supporting the argument that the defendants' constitutional rights were violated by their admission in evidence. We find no reason to disturb the determination of the court below in this respect.

## III.

The verdict, it is said, should be set aside as against the weight of the evidence.

The confessions made by the defendants and the evidence corroborative of them, together with the other facts adduced at the trial have already been analyzed and discussed at length and we see little useful purpose in repeating this process further with greater detail. Suffice it to say there was ample evidence and sufficient proof to support the verdict.

The testimony of the appellants at the trial varying from their previous statements made it a function of the jury to determine which of these two conflicting conclusions was worthy of credence. *State v. Cordasco,* 2 *N. J.* 189 (1949).

554

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■ A verdict will not be set aside as against the weight of the evidence except where it clearly appears it is the result of mistake, passion, prejudice or partiality. *State v. Boccadoro,* 105 *N. J. L.* 352 *(E. & A.* 1929); *State v. Hauptmann,* 115 *N. J. L.* 412 *(E. & A.* 1935); *State v. Cole, supra; State v. Cordasco, supra; State v. Donohue,* 2 *N. J.* 381 (1949); *State v. Pierce, supra; State .v. Goodman, supra; State v. Peterson,* 10 *N. J.* 155 (1952). *Rule* 1:2–19(a).

## IV.

When English was taken to police headquarters, he was interrogated by a patrolman who took notes in the form of a memorandum as to what English said—not all he said but some of the things he uttered. English never saw the memorandum; it was not read to him nor did he acknowledge or sign it in any way. He was not even conscious of its existence nor what was written in what the officer deemed to be the performance of his duties. It is conceded the memorandum might have been used at the trial to refresh the officer's recollection but, after it was marked for identification, it was finally admitted into evidence although the court said it was for the limited purpose of ascertaining whether the officer or English first mentioned the names contained in it.

The ruling is squarely against our pronouncement in *State v. Cleveland,* 6 *N. J.* 316 (1951), in which we cited *Jenkins v. State,* 35 *Fla.* 737, 18 *So.* 182 *(Sup. Ct.* 1895); *Wells v. U. S.,* 257 *Fed.* 605 (9 *Cir.,* 1919); *State v. Strain,* 84 *Ohio App.* 229, 82 *N. E. 2d* 109 *(Ct. App.* 1948); *State v. Meharg,* 196 *La.* 748, 200 *So.* 25 *(Sup. Ct.* 1941); *Comm. v. Simpson,* 300 *Mass.* 45, 13 *N. E. 2d* 939 *(Sup. Jud. Ct.* 1938).

■ The pith of these decisions we determine quite firmly established that "where the transcribed statement is not read by or to the accused and he does not sign it or otherwise acknowledge its correctness, the oral testimony of

witnesses, and not the transcript, is the only admissible evidence * * *."

The compelling, underlying reason was that a written statement would shear "the balance of the oral testimony in the case of the weight it would otherwise have" and was erroneous because a thing in writing carries, particularly with the layman, a weight of its own. Exhibit S-89 should not have been admitted in evidence despite the limitations sought to be imposed upon it.

It was a written monument of evidential value and was present in the jury room and a constant reminder to the jury of its contents. *Springer v. Labow*, 108 *N. J. L.* 68 (*Sup. Ct.* 1931).

▮▮▮ The use it was subsequently put to and the remarks concerning it made by the prosecutor in his summation intensified the error of its admission and made it prejudicial to the substantial rights of the defendants.

## V.

The rights of English, it is said, were trespassed upon when the prosecution made known to the jury it had an F. B. I. record of the defendant and attempted to attack his credibility by the use of it.

This disclosure was made by the prosecutor when the defendants demanded the production of the criminal record on which the State was relying during interrogation of the witness as to whether he had ever been convicted of crime.

▮▮▮ The State has the right to prove prior convictions of crime to affect credibility and may inquire of a witness in such an endeavor. *Roop v. State*, 58 *N. J. L.* 479 (*Sup. Ct.* 1896); *State v. Henson*, 66 *N. J. L.* 601 (*E. & A.* 1901); *State v. Runyon*, 93 *N. J. L.* 16 (*Sup. Ct.* 1919), affirmed 94 *N. J. L.* 265 (*E. & A.* 1920); *State v. Young*, 93 *N. J. L.* 396 (*E. & A.* 1919); *State v. Rodia*, 132 *N. J. L.* 199 (*E. & A.* 1944). A prosecutor has no right, however, to employ such questions if in fact he has knowl-

edge that no such convictions exist. To create a false premise for the consideration of the jury is patently improper practice.

 The prosecutor announced he had the F. B. I. record of the defendant and repeated it in the presence of the jury. It was not stricken nor was the jury instructed in reference to it. The jury may well have conceived the impression that English violated the law, occasioning an investigation by the F. B. I. The prestige enjoyed by this agency and the confidence reposed in it by the American public may have prejudiced the defendant in the eyes of the jury by the repeated reference to the F. B. I. record. It was improperly injected and the disclosure should not have been permitted in the presence of the jury.

We see no unfair or improper use made of the right granted by statute, R. S. 2A:81–12, to determine whether the witness Rubie English had ever been convicted of crime. The only questions asked of her, on objection, were sustained and we discern no prejudicial error in this respect.

## VI.

There were introduced in evidence, over objection, a full soda bottle, S-40, and a bottleneck, S-44, exhibits found at the scene of the crime, purporting to be the weapons of assault.

Lt. Sharpe, a fingerprint expert with 25 years of experience, testified he dusted the exhibits and found only fragmentary ridges lacking characteristics sufficient for comparison and, having so concluded, wiped the exhibits clean by applying a rag over the entire surface.

The exhibits are challenged because the State "destroyed and suppressed" unfavorable evidence and because the articles were not in substantially the same condition as of the time of the offense.

On oral argument, however, the appellants frankly admitted there was no intentional or willful act on the part

of the State's representative in reference to these exhibits and, if there was any impropriety in the wiping of the bottles following the examination, it occurred "inadvertently or by mistake."

The full factual situation was developed; a detailed explanation was given by the expert, including the original condition encountered, the procedure employed, the reasons for it, and the end result. Nothing was withheld.

The utility of the exhibits, under these circumstances, was not completely destroyed. The jury still had the right to attach to them such significance and weight it thought warranted by the full disclosure of the treatment to which they were subjected. Their admission constituted no prejudicial error.

## VII.

George English, a State's witness, testified in the middle of March 1948 he found two coats in a shed at his home, one of which, a "short army type coat," was his, the other belonged to Cooper. He knew it was Cooper's because "the right-hand pocket was torn" and he had seen Cooper wear it in 1947. This coat, over objection, was admitted in evidence and marked S-110, and his own likewise admitted and marked S-111.

The witness further testified at the time there was a bottle enclosed in a sock in the pocket of his own coat. These also, over objection, were received and marked in evidence, S-112.

The witness laid the coats on a tool chest, leaving the bottle in the pocket of one. For over two years, from April 1948 to August 1950, he was in prison. On his release he found these coats hanging on nails in the cellar but the bottle and sock had been removed and were on a ledge between two beams or sleepers. A photograph of the cellar, showing the position where English discovered the bottle and sock, was received in evidence, over objection, and

marked S-114. The admission of these exhibits is challenged as prejudicial error.

The State seeks to sustain the ruling so made because this witness' testimony is corroborated in the holographic confession by Cooper wherein he stated Mrs. Horner was struck with a bottle or a brick in a sock; that the testimony of Melrose Diggs, a defense witness, proves Cooper had been in George English's house on January 11, 16 days before the crime; and that Mr. Eldracher, a cigar salesman, who saw the two colored men running out of the store on the day of the crime, stated one of them wore "a short coat which is the color that the army wears." It naively suggests: "Cooper had ample opportunity of wearing George English's coat on the day of the crime since George English was incarcerated at the time," as if the passage of time alone was sufficient to create the presumed physical fact desired.

The reasoning is nebulous. Except for S-110, the record shows no justification for the admission of these exhibits. They were not found at the home of either of the defendants but at the residence of George English, and the bottle in a sock was in his coat pocket, not the defendant's. There was no evidence in the record showing S-112 was ever in the possession, under the control, or belonged to the defendant, or was used in the commission of the crime charged. Quite to the contrary, the State asserts S-40 and S-44 were the objects constituting the blunt instruments used in the murder.

 Only by conjecture and speculation could the jury conclude anything in reference to the exhibits offered. S-110 may have had some materiality; at any rate, its admission was harmless. But the relevancy of Exhibits S-111, 112 and 114 escapes us completely. Their admission, we think, was improper, prejudicial and harmful.

## VIII.

A witness, Dr. Sullivan, had been called to the police station by the prosecutor's office during the period the

defendants were held in custody prior to their arraignment. He was present when the accused signed statements which they had given to the police. Immediately after the signing, the accused stripped and underwent a thorough medical examination by Dr. Sullivan.

The jury was out of the courtroom while counsel debated the admissibility of the confessions so obtained and Sullivan was called and testified extensively as to the results of his examinations of all six accused. On direct examination, he told of discovering English's cardiac condition and said that other than that "the examination was essentially negative."

Defense counsel, on cross-examination, elicited the observation that English "appeared just a little mumbly or a little confused, you might say," and that he was nervous. After repeated questioning on this point, the witness adopted the questioner's phrase, "He was highly nervous."

When the jury was brought back to the courtroom, Dr. Sullivan was recalled for a very short direct examination and then on cross-examination said he regarded these accused as his patients, at least for so long a period as he was examining them. The interrogating counsel at that point moved "the entire record of the testimony of Dr. Sullivan be expunged on the ground of confidential relationship between doctor and patient" and, to his admitted astonishment, the prosecutor promptly acceded to this motion. Counsel then attempted to limit the testimony he wished struck to only that part dealing with certain questions he had asked of the doctor. The State would not agree to this limitation but still agreed to striking the "entire record of the testimony."

The motion was denied and the cross-examination continued. It developed, under questioning by defense counsel, that, in the witness' opinion, English suffered from psychoneurosis due partly to his small stature and his cardiac condition. As to this, the doctor said: "Cardiac patients have one outstanding symptom, they would like to keep anything from making their heart worse so they will go

along and testify to anything you suggest." He testified further that English was in a highly suggestible condition and that "under mental pressure he would not be acting of his own free will."

At this point the prosecution claimed surprise and sought to neutralize the entire testimony of Sullivan. On colloquy between court and counsel, it appeared the neutralization was directed to the testimony "elicited at this session" because "of course, the jury hasn't heard any other testimony," and this restriction was accepted by the State without protest.

The defense urges it was error on the part of the trial court to permit the State to neutralize the testimony of its own medical witness on the ground of surprise because the testimony objected to was not inconsistent or in conflict with the prior statements of the same witness and because the objection was addressed to all the testimony of the witness instead of being confined to the specific points about which the State claimed to be surprised. It is alleged also it was improper to allow neutralization where the surprise testimony had been brought out on cross-examination, and to refuse defense counsel the right to seek by further cross-examination after the neutralization to rehabilitate so much of the doctor's testimony as may have been favorable to the defendants.

 The general doctrine of neutralization has been stated on a number of occasions.

"While the rule is well settled that a party who offers a witness will not be permitted afterwards to impeach his character for truth and veracity, or to impugn his credibility by general evidence tending to show him to be unworthy of belief, yet it is equally well established that the party will not be precluded from proving the truth of any particular fact, by any other competent testimony, in direct contradiction to what such a witness may have testified." *Ingersoll v. English, Executor*, 66 N. J. L. 463 (*Sup. Ct.* 1901).

 The party calling the witness may, when surprised by his testimony, examine him as to previous contradictory statements, not to impair his credibility generally, but to

show one or the other of the statements must be erroneous. Such evidence of contradiction "neutralizes the statement on the stand, by showing that the witness cannot be correct in both statements and is as likely to be wrong in the latter as in the former." *Wigmore on Evidence* (3d ed.), sec. 902.

Thus, in *State v. Johnson,* 73 *N. J. L.* 199 (*Sup. Ct.* 1906), the prosecutor was allowed to question his own witness about a statement made before the grand jury inconsistent with his later testimony at the trial. The appellate court found no error in the admission of the question objected to, saying:

"The objections were that a party could not thus interrogate his own witness, and that the question was leading. The learned trial judge regarded the situation as one of surprise, and on that ground admitted the question, as we think, rightly."

There was a similar holding in *State v. Kwiatkowski, supra:*

"In the case at bar we find no attempt to impeach the particular witness' character for truth and veracity, but an attempt to revive his recollection as to matters which he had testified to before, and concerning which his memory appeared to have lapsed. The prosecutor was surprised at the testimony given on the trial of the case, and clearly had the right to probe the witness as he did."

Surprise is an elementary requisite to the introduction of evidence to neutralize the testimony of one's own witness, *State v. MacRorie,* 86 *N. J. L.* 401 (*Sup. Ct.* 1914), and such evidence must be directed to the specific portion of the testimony as to which the surprise is claimed. *State v. D'Adame,* 84 *N. J. L.* 386 (*E. & A.* 1912).

It is not necessary to review in further detail the voluminous testimony given by the witness, first, in the absence of the jury while the admissibility of the confessions was under consideration, and later in the answers elicited on subsequent interrogation before the jury and prior to the claim of surprise. Similarly, we need not pass upon the various contentions made by the appellants as the point has become

academic in view of our conclusion that the convictions must be set aside on other grounds.

On a retrial the basis for the surprise here alleged obviously would not exist as both sides are now fully aware of such conflicts or inconsistencies as appear from the record. The difficulties which may be encountered in a new trial cannot be ascertained until the witness is again called and the developments unfold. Our attempt to adjudicate them here would be premature and futile.

## IX.

The defendants, asserting their admissions were not voluntary, sought to establish they were motivated into yielding to police pressure, and to this end counsel attempted to show the extent to which the crime had been the subject of newspaper comment and publicity by offering in evidence newspapers containing articles about it.

The trial court rejected them, expressing the thought they would be relevant only in connection with a motion for a change of venue. No authorities are submitted by the defendants but the refusal to accept the newspapers is nevertheless pressed on appeal. Its relevancy is not further discussed nor is its applicability to the voluntariness of the confessions demonstrated.

Evidence of the kind here in question is usually offered to support a motion for a change of venue. It is designed to show the residents of the county in which the crime was committed are so aroused they would not be qualified to sit as a jury to try an indictment of one accused of the offense. In such cases the test is whether an impartial jury could be obtained from among the citizens of the county. *State v. Lynch,* 103 *N. J. L.* 64 (*E. & A.* 1926). The evidence submitted must be clear and convincing proof that a fair and impartial trial could not be had before a jury of the county in which the indictment was found. *State v. Collins,* 2 *N. J.* 406 (1949).

Those cases deal with the effect created upon the minds of persons chosen as jurors by the publicity and general public excitement, but we are unable to divine the relevancy of the proffered newspapers to the mental or physical reactions of the defendants at the time of making their confessions. We see no error in the court's ruling.

## X.

In an endeavor to bring out the reasons for various alleged inconsistent actions on the part of the police, particularly in relation to the question of detaining the defendants and interrogating them at length, complaint is made of the limited cross-examination permitted of the State's witnesses, mostly in reference to why a certain conflicting course of conduct was pursued by them.

Other than a footnote in the defendants' brief referring to the evidence of five different witnesses and numerous pages of testimony, the specific questions, their materiality and relationship to the balance of the evidence are not set out nor are any authorities submitted upon which the defendants rely.

Further ambiguity is engendered by this quotation from the brief: "In the footnote we point out but a few of the countless examples of this restriction of cross examination," implying, we presume, that the court is to examine the record and adjudicate the "countless examples of this restriction of cross examination" which are not specified or particularly called to our attention. In substance, we are improperly asked to rule upon certain testimony as a class no matter where found in the record.

"Under our present system of appeals, the brief of the appellant, besides containing his argument, takes the place of the assignments of error and specification of causes for reversal. *Rules* 1:2–8 and 1:3–2(e). The appellate court is under no duty to search the record for error; it is the function of counsel by the brief to call the court's attention to the errors by which his client is aggrieved, to set forth

564

specifically the judicial action complained of." *Shade v. Colgate,* 4 *N. J. Super.* 356 (*App. Div.* 1949).

Nevertheless, our observation, as contained elsewhere in this opinion, is that the greatest latitude was given the defendants throughout the entire case to search and examine at unusual length. We think the same opportunity existed in this instance and see no error.

## XI.

The court below erred, it is said, in restricting the cross-examination of the State's witness Henry W. Miller as to the contents of the confession of Collis English, contending the result of this restriction was that the confession was placed before the jury both in written form as well as by oral reading without the defendant having had an opportunity before the jury to cross-examine the person who actually took down and typed the confession as to the contents thereof.

The record shows to the contrary. When the witness first took the stand in the presence of the jury, he underwent a lengthy and searching examination both on direct and cross—as to the method of taking down the statements and the information therein contained. On that occasion the cross-examination was not restricted and defense counsel continued their interrogations until they proclaimed themselves "finished." The witness was then excused.

Several days later when he was recalled to read the statements so taken, the appellants attempted to resume interrogation as to those matters previously dealt with. The court refused to allow it, holding it was not proper cross-examination at that time.

 The order of proof and the reopening of the case rest in the sound discretion of the trial court. *O'Neil v. Bilotta,* 18 *N. J. Super.* 82 (*App. Div.* 1952), affirmed 10 *N. J.* 308 (1952); *Carlo v. Okonite-Callender Cable Co.,* 3 *N. J.* 253 (1949).

Here full opportunity for cross-examination had already been granted. The recall of the witness was for the limited purpose of reading statements previously identified and admitted in evidence. The function was a mechanical one which could have been performed by others and was not additional testimony by the witness.

■ The refusal to reopen a cross-examination long since completed was not, under these circumstances, an abuse of the court's discretion and did not constitute error.

## XII.

■ Contending it was vital the defense be given an opportunity to explore the facts which led the police to their various shifting theories as to how the murder had been committed, error is alleged in the refusal to permit the answering of two questions submitted to the State's witness Toft on cross-examination.

This field of endeavor, from an examination of the record, indicates an extensive exploration in which but few limits were placed upon the probings indulged in by the defendants.

The questions related to information supplied to Toft immediately after the crime had been committed by persons at the scene. It had been included in his preliminary report to police headquarters even though based purely on hearsay, in order to expedite the spreading of a general alarm for the apprehension of the criminals.

We are not willing to say the exclusion of the two questions presented could have been, as developed here, prejudicial.

## XIII.

The defendants' request to charge, C-4, asked the jury be instructed it had a right to consider the fact the State had failed to produce "as witnesses before you material police witnesses who were engaged in the investigation of the crime here being considered from the time that it occurred

\* \* \*" and who were present at the time the confessions and statements were taken. It then asserts: "namely, Lt. William T. Stanley."

Starting in the plural and referring to "witnesses," the request ends in the singular naming an individual. It is confusing and inaccurate. It is, also, legally incorrect as the mere failure to produce a witness does not of itself permit the jury to infer that he, in the language of the request, "would have testified contrary to the testimony given by other witnesses produced on behalf of the State."

*State v. Elliott*, 129 *N. J. L.* 169 (*Sup. Ct.* 1942), affirmed 130 *N. J. L.* 174 (*E. & A.* 1943), cites and follows *State v. Callahan*, 76 *N. J. L.* 426 (*Sup. Ct.* 1908), where the rule is announced that the jury has the right to consider the failure to call a witness if unexplained; but the law does not go to the extent of permitting an inference that he would have "testified contrary to the testimony given by other witnesses."

Moreover, the request to charge was improper as the absence of this witness was fully explained. He had been operated upon and was confined to his home. Under these circumstances, we see no error.

Request C-39 was based on a factual situation not supported by the record. It read:

"39. The fact that Collis English had knowledge that the police were looking for him, remained in his home awaiting the police may be considered by you as indicating a lack of consciousness of guilt on his part."

There was no evidence English had knowledge the police were looking for him. He was picked up for interrogation on other matters and was not at the time even a suspect in the murder case then being investigated. The detailed factual situation relating to his apprehension and detainment was presented to the jury. We find no error in the refusal to charge as requested.

## XIV.

Lastly, the defendants say the verdict was inconsistent with the evidence, as the alleged principal (Forrest, who supposedly "dealt the fatal blow") was acquitted "while the others aided and abetted" and "the jury could not find Cooper and English guilty without first convicting Forrest," relying mainly on *State v. Marshall, 97 N. J. L.* 10 (*Sup. Ct.* 1922).

There the tax collector of Kearny was indicted jointly with one of his clerks for the embezzlement of public funds. Speaking of the complaint made, the court pointed out:

"In the present case the charge of the grand jury was that Caithness, as town collector, had embezzled funds belonging to the town, and that Marshall aided and abetted, counseled, incited, and procured him to commit the embezzlement."

The court continued:

"But this principle of law presupposes the guilt of the party who is alleged to have actually committed the criminal act; for a person cannot, in reason or in fact, be the aider and abettor of another in the doing of a criminal act unless such criminal act has in fact been performed by that other."

The analysis was there hypothecated on the charge made in the indictment, which alleged only aiding and abetting.

"It is urged on behalf of the State that the proofs conclusively demonstrated that these moneys had actually been misappropriated by the Marshall woman, without the knowledge of the town collector, and that therefore the conviction ought to be sustained. But this contention cannot prevail. *The only charge laid against her in the indictment was the inciting, counseling, aiding, and abetting of Caithness in his alleged violation of the 168th section of the Crimes Act.* She could not be guilty of the crime denounced by the statute except as an aider and abettor, for the reason that she was not the collector of taxes of the town, and therefore could not embezzle moneys received or collected by her as such collector." (Italics supplied.)

568

Neither the reasoning nor the conclusion is applicable in the instant case. Here the defendants are all charged as principals and, the *corpus delicti* having been proven, each stands upon his own bottom, giving the jury the right, if it so determines from the evidence, to convict some and to release others.

It was so construed by the trial judge, who charged:

"Now, however, if your verdict is not the same verdict as to all of the six defendants, then your verdict as to each of the six defendants must be as to how you find for each defendant and in each instance you will name him and you will say: 'We find the defendant, naming him, not guilty or we find the defendant, naming him, guilty of murder in the first degree; or we find the defendant, naming him, guilty of murder in the first degree and recommend imprisonment at hard labor for life,' again remembering that there are six defendants and that the facts with respect to each defendant must be considered separately by you."

From the record, this conception seems entirely in accord with the defendants' view of the case as no objection or contrary thought was noted.

Under our law, all those who conspire to commit a crime and participate in some way in its commission are joint principals and each is as guilty as the person who actually commits the crime and is liable to the same punishment. They are indicted, in the language of the statute, as principles and are not accused of being accessories or aiders and abettors.

The distinction between principal and accomplice or aider and abettor has been abolished in our jurisdiction for purposes of indictment and punishment. *Engeman v. State,* 54 *N. J. L.* 247 (*Sup. Ct.* 1892); *Roesel v. State,* 62 *N. J. L.* 216 (*E. & A.* 1898); *State v. Wilson,* 79 *N. J. L.* 241 (*Sup. Ct.* 1910), affirmed 80 *N. J. L.* 467 (*E. & A.* 1910); *State v. Spence,* 81 *N. J. L.* 265 (*Sup. Ct.* 1911); *State v. Hanrahan,* 87 *N. J. L.* 1 (*Sup. Ct.* 1915), affirmed 88 *N. J. L.* 391 (*E. & A.* 1915); *State v. Carlino,* 98 *N. J. L.* 48 (*Sup. Ct.* 1922), affirmed 99 *N. J. L.* 292 (*E. & A.*

1923); *State v. Churchill,* 105 *N. J. L.* 123 (*E. & A.* 1928); *State v. Dolbow,* 117 *N. J. L.* 560 (*E. & A.* 1936).

The appellants concede all this but say such modernization does not permit "a grab bag" type of justice. The jury's return, in pattern, closely followed the failure of the introduction into evidence of the confessions made by the acquitted defendants plus one who never made such a statement. The State's evidence against them was considerably diminished by the court's ruling, the propriety of which, under the instant circumstances, is not appealable and is not before us.

Different results, as concluded by the jury on the evidence submitted to it, are necessarily possible under our procedure, where each defendant's responsibility is appraised and adjudicated individually on the evidence against him. The jury's discharge of one does not mean the discharge of all any more than the jury's conviction of one would automatically mean the conviction of all involved.

The judgment below is reversed for the reasons herein cited and the cause remanded for a trial *de novo.*

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.