15 A.3d 844

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MICHAEL GORE, JR., DEFENDANT–RESPONDENT.

Argued October 26, 2010—Decided March 22, 2011.

*William A. Haumann*, Assistant Prosecutor, argued the cause for appellant (*Joseph L. Bocchini, Jr.*, Mercer County Prosecutor, attorney).

*Marcia H. Blum*, Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars*, Public Defender, attorney).

*Brian J. Uzdavinis*, Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Paula T. Dow*, Attorney General, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

A jury convicted defendant Michael Gore Jr. of the murder of eighty-five-year-old Victoria Colton and of related offenses. On appeal, the Appellate Division reversed based on an evidential

ruling by the trial court. The panel concluded that the trial court erred in allowing the jury to have a copy of defendant's formal confession, which the State had transcribed as he was providing it, but which defendant neither signed nor acknowledged to be correct. Applying the plain error standard of review, *see R.* 2:10–2, the panel found that prior case law compelled the conclusion that the trial court's admission of the document memorializing defendant's unacknowledged, transcribed formal confession required a new trial.

We granted the State's petition for certification, *State v. Gore,* 201 *N.J.* 440, 991 *A.*2d 229 (2010), and now reverse. There is no likelihood that the error raised on appeal produced an unjust result. Defendant raised no objection when the State read from the document during the trial, when both parties referred to it during summation, or when the court belatedly marked the document as "in evidence" after both sides had treated it as such and had allowed its publication to the jury during trial. Certainly the handling of this exhibit was not "according to Hoyle"; however, that error, in the context of this trial, did not constitute plain error that clearly was capable of producing an unjust result.

The evidence supporting defendant's guilt was strong, even according to the reviewing appellate panel. We are satisfied that there has been no demonstration of a reasonable probability that a different result would have obtained had there been an objection and the document's admission been denied. The jury already had heard the details surrounding the transcription of defendant's statement from both the State and defendant, and had viewed the exhibit's contents during testimony provided by the State. Moreover, both parties referenced the document's contents during their summations. Therefore, the belated admission of the document did not change the parties' behavior in presenting, or wrapping up, their respective cases and it is not probable that the jury somehow was unduly influenced by having had in hand a physical copy of the admitted document containing the information that it had heard so much about.

The Appellate Division judgment is reversed and defendant's conviction is reinstated; the matter is remanded for appellate consideration of defendant's sentencing issues, which were not addressed in the previous disposition on appeal.

## I.

We recite the facts underlying the charges against defendant based on the evidence presented at trial. For the most part, the factual account is derived from the testimony of Detective Rios, who interrogated defendant when he was arrested. The bulk of Rios's testimony concerned the context and contents of defendant's initial informal confession to Colton's murder and the circumstances under which a formal transcribed statement was taken from defendant. The latter is the "formal" confession that defendant neither signed nor reviewed. In his testimony, Rios referred to a supplemental police report he prepared from notes of defendant's informal confession, and he recited from a transcription of defendant's formal confession.

On August 7, 2000,[1] while en route to a friend's house, defendant passed by the home of Victoria Colton. Colton was a close family friend whom he regarded as a grandmother. Seeing her dog in the yard, he stopped to play with it and then noticed that Colton's back door was open. Defendant entered the house and found her purse unattended on a chair. As he removed some money from the purse, she emerged from an upstairs room, discovered the theft in progress, and threatened to call the police. Defendant went upstairs and attacked her, grabbing her by the neck and garroting her with a telephone cord from her bedroom. When Colton showed some continuing signs of life, he got a knife from the kitchen, returned to the bedroom, and cut her throat. That

---

[1] The record does not reveal an explanation for the age of this appeal by the time it wound its way to this Court. The murder occurred in August 2000, and defendant was apprehended the same month; however, the case was not tried until 2005, it was heard and decided by the Appellate Division in 2009, and reached our Court in 2010.

evening and the following morning, Colton's MAC card was used three times to withdraw cash from ATM machines. All three transactions were recorded on surveillance cameras. Colton's body was found in her bedroom on August 8, 2000, by her friends, Lisa Pointon, defendant's step-sister, and Christine Gore, his mother.

In investigating the homicide, the police obtained videotapes of the ATM transactions. Defendant's father, step-sister, and step-mother viewed the videotapes, which showed the individual making the withdrawals from Colton's bank account attempting to hide his face. The person wore a shirt bearing a distinctive logo. Defendant's father identified the person on the ATM videotapes as his twenty-five-year-old son. Also, the same evening that defendant's step-sister viewed the videotapes, she found at her parents' house a shirt with a distinct logo that matched the shirt worn by the individual on the ATM videotapes. After discussing the discovery with her father, she telephoned the police, and officers came to retrieve the shirt.

At about 3:30 a.m. on August 10, 2000, while the police were actively looking for him in connection with the homicide, defendant turned himself in at the Trenton Police Department on an arrest warrant. The warrant was based on his having left a halfway house illegally on July 25, 2000. Two officers placed him under arrest and took him to a cell where he was left alone for several hours. Later in the day, defendant was administered *Miranda* [2] warnings, signed a waiver card, and agreed to be interrogated by Detective Rios.

According to Rios, defendant initially made an informal statement in which he first denied having a MAC card. Then, after being confronted with the shirt retrieved from his parents' home and told that he appeared on surveillance videos wearing that shirt as he withdrew money with the victim's MAC card, defendant broke down weeping and confessed to killing Colton. He told Rios

[2] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

that he took her MAC card, explained how he knew her PIN number, and said that he used the card to obtain money to purchase drugs and alcohol. During this portion of the interrogation, Rios took handwritten notes that later were converted to a supplemental police report.

Defendant further agreed to provide a formal confession, which Rios transcribed on a word processor, in a question-and-answer format. The detective would type each question into the word processor before posing it and, as defendant answered the question, Rios typed in the response, thereby creating a transcribed statement as it was being provided.[3] After Rios had taken down three pages of a formal statement from defendant in that manner, a lawyer retained by defendant's family arrived and Rios stopped the transcription process. The attorney and defendant conferred, and Rios was requested to cease speaking to defendant. As a result, the formal statement that Rios had been transcribing was neither reviewed nor signed by defendant.

A Mercer County grand jury returned a four-count indictment charging defendant with first-degree murder, *N.J.S.A.* 2C:11–3; first-degree felony murder, *N.J.S.A.* 2C:11–3a(3); first-degree robbery, *N.J.S.A.* 2C:15–1; and third-degree possession of a weapon (knife) for an unlawful purpose, *N.J.S.A.* 2C:39–4(d). Defendant pled not guilty and filed a pretrial motion to suppress the shirt obtained by the police. A hearing also was conducted regarding defendant's informal confession and formal transcribed statement. For purposes of the *Rule* 104 hearing, both statements were introduced into evidence, without objection, after foundations for each were laid. *See N.J.R.E.* 104(c). After receiving testimony, the court found that the State had proven, beyond a reasonable doubt, that defendant was advised of his *Miranda*

---

[3] Subsequent to the events described herein, this Court adopted *Rule* 3:17, which mandates that custodial interrogation of an individual charged with a number of enumerated serious crimes be electronically recorded. Therefore, had this crime been committed on or after January 1, 2006, defendant's confession would have been recorded.

rights, both verbally and by reviewing and signing a written version. Further, the court found, given the nature of defendant's statement, its detail, its contents, and the manner in which it was given, that it was freely and voluntarily made; accordingly, the statement was determined to be admissible at trial.[4]

At trial, Rios testified at length about his interrogation procedure and the results of his initial interrogation of defendant. During his testimony, Rios used the supplemental police report, marked as S–3, to recall defendant's words during the informal confession. The record reflects that Rios read directly from the supplemental report when providing this testimony, after indicating that he could not recall the exchanges without referencing the document.

The prosecutor then questioned Rios about defendant's formal statement. Importantly, at no time during this line of questioning did defendant interpose an objection. At the outset of this questioning, Rios identified a three-page document, marked as S–2, which he described as the transcription of defendant's formal statement. Rios also explained the process that he used when taking that statement. At this point in the trial, the jury was excused for lunch and exited the courtroom. In the jury's absence, the prosecutor informed the court, defendant, and counsel that he planned to give the jurors a copy of the formal statement so they could read along during Rios's afternoon testimony. It bears repeating that there was no objection to the prosecutor's proposed course of action. When the trial recommenced, the prosecutor distributed copies of S–2 to the jurors and, as he read Rios's questions and Detective Rios recited defendant's responses—both of which were memorialized in the formal transcribed statement—the jury followed along on their copies of S–2.

When the prosecutor and Rios finished reading S–2, the court immediately instructed the jury as follows:

---

[4] The court also denied defendant's motion to suppress the shirt seized by the police.

As you know from the testimony regarding the *Miranda* rights, every individual charged with any criminal offense has an absolute right to remain silent. If they elect to speak to the police, they have a right to terminate that statement at any time. You are not to consider the fact that Mr. Gore chose to speak to an attorney as any evidence at all of his guilt, nor should you draw any negative inferences from that fact at all. Anyone in that position is simply exercising a constitutional right which they have an absolute right to do.

The prosecutor then collected the jurors' copies of S–2, and Rios continued testifying.

The State completed the presentation of its case and, the next morning, formally rested.[5] Defendant then testified as the only witness for the defense. He denied responsibility for Colton's death and claimed that he did not know who killed her.

When questioned about his statement to the police, which had been read by the prosecutor and Rios, he said it was partially true and partially false. The thrust of defendant's explanation was that he purchased Colton's stolen MAC card on the street from an individual he could not identify and then used it to obtain money for drugs and alcohol. The following exchange occurred during defendant's cross-examination after he asserted that the formal statement set forth in S–2 was "never made":

Q. So the police only manufactured three pages of that statement instead of a full statement?

A. That, listen, that formal statement you had up there, I don't know where that came from. Like I said, there was never no typewriter. Only notes he had took when I was up and was handwritten notes, and that's it?

Q. And you told him that you used the MAC card?

A. Yeah, I told him.

Q. You identified the shirt?

A. Yep.

Q. You said you used it at Yardville National Bank?

A. Yep.

---

5 The court reminded the prosecutor that he "did not formally rest on the record" the day before, to which counsel responded, "That's correct, your Honor, but I'll do so first thing this morning." Apparently, counsel believed that S–2 had been moved into evidence for, throughout the examination of defendant, S–2 was referred to as being "in evidence." The mistaken belief as to the document's status persisted until the jury's deliberations. *See infra* note 6.

Q. You told him about Sterlyn taking you to the bank?

A. Yep.

Q. You told him about using the MAC card at Morrisville, not once, but twice?

A. Yeah, I may have.

Q. Did you or didn't you?

A. I can't—I can't—I'm not saying—I said so, I agreed to it, it's easy for me to do that, but, you know, I'm trying to—I don't want to say nothing I ain't say. I'm not sure, but I possibly could have done it, I mean, I seen the transactions that have happened up there. I'm pretty sure they were me. So I possibly could have told him, I just don't 100 percent recall in my head.

Q. And you recall telling him about Kumba picking you up?

A. Yep.

During summation both parties referred several times to defendant's formal statement and, for purposes of its deliberations, the jury was provided with the exhibits, including S–2, the formal statement.[6] During deliberations, the jury requested transcripts of the testimony from four witnesses, among them Detective Rios and defendant. The court instructed the jurors that it would recite the prior testimony but could not provide transcripts. A read-back commenced of Detective Rios's testimony in its entirety. At the point when the read-back reached Rios's use of S–2, the court stopped because the jury had a copy of the document and stated: "This portion of the testimony involves the reading of verbatim questions and answers in S–2. Unless anyone has an objection, I'll propose that the court reporter skip this portion and

---

[6] During the trial, the court and the parties apparently believed that the formal statement, marked S–2 for identification, had been moved into evidence. The document had been marked into evidence for purposes of defendant's *Miranda* hearing, but had only been marked for identification at the trial. However, after the jury was charged and had left to deliberate, the court discovered that S–2 had not been moved into evidence and characterized the omission as "an oversight." The prosecutor asserted that the document had been moved into evidence, and recalled laying a foundation for the document. The court stated that although the document might not have been formally moved into evidence, a proper foundation for its admission had been laid, and the document had been published to the jury without objection. The court thereupon ruled that the jury would be permitted to keep the document for its review under the circumstances. Although the record had closed, the prosecutor moved, without objection, to have S–2 admitted into evidence, and the court granted the motion.

then continue from there. Is that agreeable?" There was no objection. The read-back continued the next day and, at the conclusion of Rios's testimony, the jury returned to deliberations. Thereafter, the court received a note from the jury requesting the jury charge for reasonable doubt, as well as a read-back of testimony of another witness. The court complied with those requests and responded to inquiries about testimony concerning defendant's whereabouts on the day of the murder.

The jury resumed its deliberations at 10:00 a.m. the next morning and, by 2:05 p.m., advised the court that it was at an impasse and asked for direction. The court urged the jurors to continue deliberating, noting that they had not deliberated extensively given the number of read-backs, the nature of the case, and the amount of testimony. At the conclusion of that day's deliberations, the jury requested another read-back from defendant's direct testimony. The next morning, the jury heard that read-back and again resumed deliberations. Later that day, it announced that a decision had been reached.

The jury convicted defendant on the four counts. The court merged the felony-murder count into the murder conviction and sentenced defendant to a term of life imprisonment, subject to a thirty-year period of parole disqualification. The court also sentenced defendant on the first-degree robbery conviction to a consecutive term of eighteen years in prison, subject to a nine-year period of parole disqualification, and to a concurrent term of five years on the conviction for third-degree possession of a weapon for an unlawful purpose. All sentences were made to run consecutive to a sentence that defendant already was serving for a prior, unrelated robbery.

Defendant appealed, raising for the first time the claim that the trial court erred by admitting into evidence the transcription of his formal confession statement, which he did not sign or acknowledge. Agreeing with defendant, the Appellate Division reversed his conviction and ordered a new trial. Although the panel characterized the evidence against defendant as "strong," it found

that the trial court erred when it permitted copies of the formal statement to be distributed to the jury. The panel noted that *Rule* 803(c)(5) permits use of a document to refresh a recollection, and further permits the introduction of the document into evidence when there is no objection, but concluded that prior case law provided more compelling precedent for analyzing this claim of error.

Citing earlier case law from this Court that found, in a capital case, reversible error flowing from the admission of an unacknowledged confession over a defendant's objection, *see State v. Cleveland,* 6 *N.J.* 316, 78 *A.*2d 560 (1951), the panel determined that defense counsel's failure to object to the use of the formal statement did not excuse its admission into evidence. In assessing the harm to defendant, the panel expressed concern about the number of read-backs requested by the jury and the fact that the jury had declared an impasse earlier in its deliberations. Against that backdrop, the panel concluded that it could not "discern with confidence what influence the written confession, shown to the jury at trial and given to them for use in their deliberations, might have had."

We granted the State's petition for certification asking that we address, under the circumstances, the admissibility of the formal statement and its distribution to the jury. *State v. Gore,* 201 *N.J.* 440, 991 *A.*2d 229 (2010).

## II.

Our hearsay rules of evidence clearly provide that "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is inadmissible unless encompassed by one of the stated exceptions to the rule precluding hearsay testimony. *N.J.R.E.* 801; *see N.J.R.E.* 802. One exception is found in *Rule* 803(c)(5), which provides for the use of a written statement to refresh one's recollection.

A statement concerning a matter about which the witness is unable to testify fully and accurately because of insufficient present recollection if the statement is contained in a writing or other record which (A) was made at a time when the fact recorded actually occurred or was fresh in the memory of the witness, and (B) was made by the witness or under the witness' direction or by some other person for the purpose of recording the statement at the time it was made, and (C) the statement concerns a matter of which the witness had knowledge when it was made, unless the circumstances indicate that the statement is not trustworthy; provided that when the witness does not remember part or all of the contents of a writing, the portion the witness does not remember may be read into evidence but shall not be introduced as an exhibit over objection.

[*N.J.R.E.* 803(c)(5).]

*Rule* 803(c)(5) "is a virtual restatement of former Rule 63(1)(b)." 2D *New Jersey Practice: Evidence Rules Annotated,* comment on *N.J.R.E.* 803(c)(5) (John H. Klock) (3d ed.2009) [hereinafter Klock, *Evidence Rules Annotated* ] (noting also that codified rule "incorporates the common law hearsay exception known as past recollection recorded"). The modern *Rule* differs from its predecessor in that it contains a provision requiring the court "to examine the circumstances to determine the trustworthiness of the document."

█ Several showings must be made for a statement to be admissible under *Rule* 803(c)(5). The threshold requirement is that the witness must be shown to have an "impaired memory." *State v. Williams,* 226 *N.J.Super.* 94, 103, 543 *A.*2d 965 (App.Div. 1988); *see also State v. Ross,* 80 *N.J.* 239, 253–54, 403 *A.*2d 457 (1979) (explaining that past recollection recorded "fills an evidential gap when the witness's memory has failed"). Once that is demonstrated and the court is satisfied that the witness is unable to testify fully and accurately about the subject of the written statement, then the hearsay exception permitted in *Rule* 803(c)(5) becomes applicable. *See* Biunno, *Current N.J. Rules of Evidence,* comment on *N.J.R.E.* 803(c)(5) (2010); *State v. Hacker,* 177 *N.J.Super.* 533, 539, 427 *A.*2d 109 (App.Div.1981); *Johnson v. Malnati,* 110 *N.J.Super.* 277, 265 *A.*2d 394 (App.Div.1970). That said, the witness does not have to be "utterly unable to remember anything in the document" in order to permit the witness to read, or to allow into evidence, that portion which the witness cannot recall. Klock, *Evidence Rules Annotated, supra,* comment on

*N.J.R.E.* 803(c)(5); *see Dalton v. Barone,* 310 *N.J.Super.* 375, 378, 708 *A.*2d 783 (App.Div.1998); *State v. Wood,* 130 *N.J.Super.* 401, 408–10, 327 *A.*2d 440 (App.Div.1973).

Also, the proponent of the evidence must establish that the statement "was made at a time when the fact recorded actually occurred or was fresh in the memory of the witness." *N.J.R.E.* 803(c)(5)(A); *see Ross, supra,* 80 *N.J.* at 253, 403 *A.*2d 457; *Hacker, supra,* 177 *N.J.Super.* at 539, 427 *A.*2d 109. The statement must have been made "by the witness or under the witness' direction." *N.J.R.E.* 803(c)(5)(B); *see Ross, supra,* 80 *N.J.* at 253, 403 *A.*2d 457; *Hacker, supra,* 177 *N.J.Super.* at 539, 427 *A.*2d 109. Section (C) of *N.J.R.E.* 803(c)(5) also requires that the statement concern "a matter of which the witness had knowledge when it was made." *See Hacker, supra,* 177 *N.J.Super.* at 539, 427 *A.*2d 109. Finally, the *Rule* specifies that "the portion the witness does not remember may be read into evidence but [the statement] shall not be introduced as an exhibit over objection." *N.J.R.E.* 803(c)(5). In this important respect, *Rule* 803(c)(5) does not follow its federal counterpart, *Federal Rule of Evidence* 803(5), which provides that "the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party."

It is that last restriction in *Rule* 803(c)(5) that is the focus of this appeal. Defendant does not challenge Detective Rios's recitation at trial from the formal transcribed statement as a refreshed recollection, which allows us to accept as a premise for purposes of this appeal that in all other respects the document met the requirements of *Rule* 803(c)(5).[7] Defendant's only claim of revers-

---

[7] That said, the handling of this document left much to be desired in terms of technical compliance with the *Rule's* requirements. The State clearly laid a foundation for S–3, Detective Rios's twelve-page supplementary report, by asking Rios if referring to the report would refresh his recollection. However, the State skimmed lightly over the basic foundational requirements for *Rule* 803(c)(5) when moving on to discuss S–2. When S–2 was shown to Rios, he simply stated that it was the "three-page statement I started taking from Michael Gore" and he

ible error rests on the trial court's belated admission into evidence of the unobjected-to transcribed formal statement of confession, which defendant had neither signed nor reviewed.

## III.

### A.

The appellate panel below acknowledged that *Rule* 803(c)(5) permits a witness to read aloud the contents of a writing that he or she cannot recall and provides no bar to its admission, absent an objection. However, in concluding that the document's admission was error, the panel primarily was influenced by *State v. Cleveland*, 6 *N.J.* 316, 78 *A.*2d 560 (1951), a decision that predated the 1967 codification of the *New Jersey Rules of Evidence.*

In *Cleveland, supra,* a defendant was apprehended in Virginia for a murder committed in New Jersey. 6 *N.J.* at 325, 78 *A.*2d 560. While in Virginia, detectives interrogated the defendant in the presence of a stenographer who recorded the interrogation. *Ibid.* Only after the defendant was returned to New Jersey did the stenographer "transcribe[ ] his shorthand notes into a typed statement in question and answer form." *Ibid.* The transcribed statement was neither read to the defendant nor signed by him and, prior to trial, the defendant was not provided with an opportunity to review it. *Ibid. Over objection,* the statement was admitted into evidence at the defendant's capital trial. *Ibid.* He was convicted of first-degree murder and sentenced to death. *Id.* at 319, 78 *A.*2d 560.

On review, the *Cleveland* Court stated the issue as whether "a voluntary statement made under the circumstances here de-

---

confirmed that the document accurately reflected the questions posed to, and answers provided by, defendant. He never was asked whether he was "unable to testify fully and accurately" about S–2 "because of insufficient present recollection." *N.J.R.E.* 803(c)(5). Further, the prosecutor did not ask Rios whether he was unable to recall presently the contents of S–2, nor did the prosecutor attempt to refresh Rios's recollection by showing him S–2.

scribed, which is not shown or read to the accused nor signed or acknowledged by him, is admissible in evidence in a criminal trial." *Id.* at 326, 78 *A.*2d 560. After examining case law from New Jersey and other jurisdictions, the Court held that "where the transcribed statement is not read by or to the accused and he does not sign it or otherwise acknowledge its correctness, the oral testimony of witnesses, and not the transcript, is the only admissible evidence of the purported confession." *Id.* at 331, 78 *A.*2d 560. The Court did note that witnesses to the statement "may, for the purpose of refreshing their recollections, where necessary, refer to notes made at the time by them, or under their supervision." *Id.* at 329, 78 *A.*2d 560. However, the Court concluded that it was "not willing, in [a case] where the death penalty is one of the issues to be decided by the jury, to depart from what we consider the well entrenched and justified rule [against admission of the document itself]." *Id.* at 331, 78 *A.*2d 560.

Having determined that the admission was erroneous, the Court further determined that the error "was also prejudicial," *ibid.*, explaining itself in language that persuaded the Appellate Division to hold as it did in this case:

True, on a retrial the stenographer might testify to substantially everything contained in the written statement, but we are inclined to the view that the writing shears the balance of the oral testimony in the case of the weight it would otherwise have and is erroneous because:

"A thing in writing carries, particularly with the layman, a weight of its own. When the jury withdrew they took with them their recollection of the defendant's testimony and their recollection of Jacobson's testimony and, in addition, this exhibit, which not only was a thing in writing but because of that fact was a present and constant reminder to the jury of its contents. It may have been the fulcrum upon which the verdict turned."

[*Ibid.* (quoting *Springer v. Labow,* 108 *N.J.L.* 68, 155 *A.* 476 (Sup.Ct.1931)).]

Accordingly, the *Cleveland* Court reversed the defendant's conviction and ordered a new trial. *Id.* at 332, 78 *A.*2d 560.

*Cleveland*'s holding, establishing two evidential prerequisites for admitting a transcribed confession into evidence, namely that the statement must have been (1) read by or to the defendant, and (2) either signed or acknowledged by the defendant in some way, *id.* at 331, 78 *A.*2d 560, became an embedded part of our common law

evidentiary doctrine.[8] Post-*Cleveland,* and prior to the codification of the *Evidence Rules,* when a defendant had acknowledged the statement by signing it, courts in this state readily upheld admission of a written confession over objection. *See, e.g., State v. Monahan,* 16 *N.J.* 83, 89–90, 106 *A.*2d 287 (1954) (admitting son's statement confessing to murder and inculpating father because father had signed each page of statement and appended additional sworn statement, which swore that "every word" of statement was true); *State v. Dunlap,* 61 *N.J.Super.* 582, 585–86, 161 *A.*2d 760 (App.Div.1960) (finding admission of defendant's statement harmless because "an almost identical confession" made by co-defendant and adopted by defendant had been admitted). Even when a defendant acknowledges only part of the correctness of the statement, the admission of a written confession has been upheld. *See State v. Smith,* 27 *N.J.* 433, 458–59, 142 *A.*2d 890 (1958) (reiterating that "[i]f it was signed or otherwise admitted by him to be correct, it is admissible [over objection]"); *see also State v. Lanzo,* 44 *N.J.* 560, 565, 210 *A.*2d 613 (1965) (applying principle that partial acknowledgment can suffice to allow for admission of confession document); *State v. Bindhammer,* 44 *N.J.* 372, 387–88, 209 *A.*2d 124 (1965) (finding no error in admission into evidence of unread, unsigned transcript of defendant's inculpatory and exculpatory statements, when document's admission followed verbatim reading of it into record and defense counsel had "requested that the statement itself be admitted into evidence as an exhibit").

That said, *Cleveland* and its progeny preceded both the seminal decision in *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16

---

[8] Not long after the decision in *Cleveland,* those prerequisites were reinforced in *State v. Cooper,* 10 *N.J.* 532, 554, 92 *A.*2d 786 (1952) (rejecting admission of patrolman's memorandum containing notes about defendant's interrogation where memorandum did not satisfy either of *Cleveland's* two requirements). The defendant in *Cooper, supra,* had not read or signed the memorandum, and prior to trial was not aware of its existence. 10 *N.J.* at 554, 92 *A.*2d 786. Relying on *Cleveland,* this Court held that admission of the memorandum constituted prejudicial error, although conceded that "the memorandum might have been used at the trial to refresh the officer's recollection." *Ibid.*

*L.Ed.*2d 694 (1966), and the 1967 codification of the *New Jersey Rules of Evidence*. *Cleveland* represents case law that has been superseded by the adoption of our formal rules of evidence, which represent a cohesive and comprehensive approach to the presentation of evidence in our trials, criminal as well as civil. As we have stated before, although some common law exceptions may pertain, the *New Jersey Rules of Evidence* "place both the bench and the bar on notice of the fundamental framework for the admission of evidence during a trial." *State v. Byrd*, 198 *N.J.* 319, 345, 967 *A.*2d 285 (2009) (citing Biunno, *Current N.J. Rules of Evidence*, comment 1 on *N.J.R.E.* 102 (2008) ("New Jersey's *Rules of Evidence* provide a comprehensive and coherent structure designed to provide specific instruction to the bench and bar in the vast array of evidentiary contexts that may arise in contested trials.")).

 The *Rules of Evidence*, unless otherwise stated, apply equally to civil and criminal trials. *See N.J.R.E.* 101(a)(2) ("These rules of evidence shall apply in all proceedings, civil or criminal, conducted by or under the supervision of a court."). Although the *Rules of Evidence* specify when the rules apply differently in respect of criminal trials,[9] no such specification appears in *Rule* 803(c)(5). Rather, it generally permits the admission of a document that is used to refresh a witness's memory—a past recollection recorded—unless there is an objection. That said, any document's admission remains subject to a *Rule* 403 balancing test in order to properly assess the relative prejudice and probative value of it before admitting it into evidence. That assessment for undue prejudice is an obligation of the trial court that persists whether or not an objection based on *Rule* 403 is raised.

 Moreover, an 803(c)(5) document requires an independent finding of trustworthiness that takes on added significance when the document is setting forth the out-of-court recorded statement of both the witness and another. When that other

---

[9] *See, e.g., N.J.R.E.* 104(c), 201(g), 303, 404, 410, 412, 501, 509, 608(b), 807.

person is a criminal defendant, the court's obligation when review-ing the document for admission requires a dovetailing with the *Evidence Rules'* strictures regarding admissions by criminal de-fendants. Under our codified *Rules,* a criminal defendant's con-fession constitutes an admission by a party-opponent, qualifying it as substantive evidence that may be used against that party under *Rule* 803(b)(1) when the statement is "the party's own statement, made either in an individual or in a representative capacity." Such statements are subject to *Rule* 104(c) hearings on admissibil-ity, where issues pertaining to *Miranda* rights, privilege or volun-tariness are probed and the court must determine whether "the State may introduce at a criminal trial any relevant statement made by a defendant." *See State v. Covell,* 157 *N.J.* 554, 572, 725 *A.*2d 675 (1999). It is the State that must prove, beyond a reasonable doubt, that a defendant's statement was voluntary and, if made while in custody, that the defendant knowingly, voluntari-ly, and intelligently waived the rights afforded him under *Mi-randa.* Here that showing had been made to the satisfaction of the trial court.

### B.

It is inexplicable that an exhibit was allowed to be moved into evidence after the record had closed in defendant's trial. Howev-er, as noted earlier, it is not apparent that the late discovery worked any harm on defendant. His summation referred to the document by name and to its contents. The State also referred to its contents in summation. Further, the belated marking of the document did not open the door for the jury's viewing of the document. A copy of the document already had been published to the jury during trial.

▮ Although the erroneous admission of the transcription of defendant's formal statement involves an evidential ruling that ordinarily is reviewed under an abuse of discretion standard, *see, e.g., Hisenaj v. Kuehner,* 194 *N.J.* 6, 12, 942 *A.*2d 769 (2008) (noting that "[i]n reviewing a trial court's evidential ruling, an

appellate court is limited to examining the decision for abuse of discretion" (citation omitted)), the more appropriate standard for this matter is plain error, which applies on appeal when no objection to an error is made at trial. *See R.* 2:10–2; *State v. Frisby,* 174 *N.J.* 583, 591, 811 *A.*2d 414 (2002) (stating plain error applies when no objection is made at trial to introduction of hearsay evidence); *State v. Bey,* 112 *N.J.* 45, 63, 548 *A.*2d 846 (1988) (applying plain error standard when defendant raised objection to admissibility of confession for first time on appeal). Application of that standard to the instant matter leads to the conclusion that the admission of S–2 could not reasonably have led the jury to reach a conclusion that it otherwise might not have reached.

■ Our *Evidence Rule* 803(c)(5) permits the introduction of a written copy of a defendant's formal confession, used as a past recollection recorded by an examining police detective, provided there is no objection and all foundational requirements, including those of *Rule* 803(b)(1), are satisfied. Here the defense did not object to the full contents of the document being put before the jury, orally and in writing, during the trial. Both sides treated the document as if it had been introduced into evidence as a full-fledged exhibit. When the procedural anomaly of the document not having been moved into evidence came to light, there was no objection. Indeed, defendant asserted that parts of the statement were true and coincided with his story. Under these circumstances, no plain error had been demonstrated and we are satisfied that there is no reasonable likelihood of a different result obtaining had the jury been deprived of the hard copy of defendant's formal statement.

Indeed, in light of the mass of evidence supporting his guilt, we are confident that no injustice occurred in defendant's trial. The testimony and exhibits produced by the State confirmed defendant's statement to the police. Various friends of defendant testified concerning his appearance, demeanor and actions shortly after the murder and in close proximity to its location. Wallace Riehl and Robert Pressley testified that defendant arrived at

Riehl's house, only blocks away from the murder scene, acting nervously at the sound of emergency vehicles passing on the street outside. Blood was observed on defendant's clothing and boots and a knife was on his person. Friends and family identified defendant in court and in the bank surveillance tapes. Witnesses identified the shirt he was seen wearing when withdrawing money using Colton's MAC card, and officers subsequently retrieved that shirt from defendant's parents' home. Sterlyn Ransom, who grew up with defendant, testified to driving him to one of the ATM's on the evening of the murder. Another friend of fourteen years, Shawnita Holloway, testified that defendant called her, crying, right after the approximate time of the murder, and then met her about an hour-and-a-half later, while he was still upset and had red eyes. Holloway further testified that the next morning defendant told her that he was going to turn himself in. And, the State produced evidence that negated the presence of any different individual's fingerprints, biological fluids, or DNA. On the other hand, defendant's story about how he came to obtain Colton's ATM card was uncorroborated and collapsed on itself when scrutinized.

Examining this record as a whole, there appears no reasonable likelihood that the exhibit S–2 caused the jury to reach a conclusion that it otherwise would not have reached.[10] In light of the many uses of the contents of this document during the trial, we conclude that any prejudice stemming from the document's admission into evidence, and belatedly so, is of inconsequential weight.

## IV.

The judgment of the Appellate Division is reversed and defendant's conviction is reinstated. We remand the matter to the

---

[10] The appellate panel's concern about the plain error standard on this record, due to the number of read-backs requested by the jury, is off-kilter. That the jury studiously reviewed a record that involved sixteen witnesses does not raise the specter of uncertainty about the jury's conclusion. Indeed, we have cautioned courts to refrain from "conjecture regarding the nature of" a jury's deliberations. *State v. Muhammad*, 182 *N.J.* 551, 578, 868 *A.*2d 302 (2005).

Appellate Division for consideration of defendant's remaining merger and sentencing arguments.

*For reversal, reinstatement and remandment*—Chief Justice RABNER, Justices LONG, LaVECCHIA, ALBIN, RIVERA-SOTO, HOENS, STERN (temporarily assigned)—7.