**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1019-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LAFAYETTE C. SUTPHIN,

    Defendant-Appellant.

_____

Submitted May 29, 2025 — Decided June 11, 2025

Before Judges Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 22-08-1376.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Rachel E. Leslie, Assistant Deputy Public Defender, of counsel and on the brief).

LaChia L. Bradshaw, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Lafayette C. Sutphin appeals from an October 23, 2023 judgment of conviction for third-degree aggravated assault with attempt to cause significant bodily injury, N.J.S.A. 2C:12-1(b)(7), and sentence, including a three-year term of probation, following a jury trial. He argues various trial errors resulted in the denial of a fair trial. For the reasons that follow, we affirm.

The criminal charges in this matter arose from defendant's physical assault of Ramon Nunez, an elderly resident of NeuroRestorative, a treatment facility for individuals with traumatic brain injuries. At the time of the incident, defendant was an employee of NeuroRestorative where he served as a life skills trainer. This role was not that of a security officer, instead defendant described his job duties as "[t]ransport[ing] [residents] to and from wherever they want to go or wherever the activity is. Could be banking. It could be to and from the day program. When we come into the home, we do meal preparation, . . . assist with hygiene care, [and] medication administration."

On May 18, 2021, police were called to NeuroRestorative on a report of an injured resident, who was identified as Nunez. Bordentown Police Officer Peter Appelmann responded to the scene and eventually arrested defendant. Defendant was subsequently indicted on one count of third-degree aggravated assault with attempt to cause significant bodily injury.

2

In a pre-trial ruling, the court denied defendant's motion seeking to introduce character evidence regarding Nunez, citing N.J.R.E. 404(a). The court stated "no facts . . . about whatever . . . [Nunez's] reputation, was or what [his] prior acts were, should come in." The court explained that past conduct is "too tenuous" because it related to the facts the court anticipated would be presented to the jury. The court noted Nunez's severe limitations and cognitive disabilities, stating "to allow what his reputation was or prior incidences . . . or propensity for violent acts has too much potential for confusion for the jury, [and] it is largely irrelevant information."

A three-day trial ensued where the State offered testimony from defendant's co-workers who were present at the time of the incident, Officer Appelmann, the responding emergency medical personnel, and others.

Tanga Purnell, NeuroRestorative's program supervisor, testified that NeuroRestorative had a "hands-off" code of conduct and a policy on patients' rights, which were posted in the facility at the time of the incident. Purnell also testified the policy was reviewed with defendant upon his hiring, and he signed and dated it as confirmation of his review.

The code of conduct provides in pertinent part:

> It is the right [of] the individual to be treated with dignity and respect; the right to sufficient clothing,

A-1019-23

food, shelter, and recreation; the right to be free of physical, sexual, and verbal harassment, abuse and neglect; the right to communicate with family, peers, members of the community through visitations[;] the right to privacy and freedom from intrusion[;] the right to communicate with family, friends, peers; the right to practice or not practice religion; the right for education[;] the right to professional age-appropriate services and treatment; the right to be involved in service planning process and to express opinions or issues concerning the services to these provided; the right to freedom from physical punishment; the right to a competent guardian if biological parents are unavailable or unwilling to assume the role; and the right to file complaints and grievances.

Purnell emphasized there were no circumstances where it would be permissible for a staff member to use force against a resident under the code of conduct. She recounted receiving a phone call from a co-worker at the Bordentown location who was "panicking and like crying," and urged her to get to that location because something had happened to a patient. She had been at a different NeuroRestorative location at the time of the call. She then contacted 911 to report that a staff member had called her to report that a patient had been attacked.

Ishona Barber-Johnson, another co-worker who was present at the time of the incident, also testified. She described Nunez as "skinny," "elderly," and "frail." She recalled that on the day in question, Nunez was approaching her for

his medication when defendant moved towards Nunez and proceeded to "pin him and choke him up against the wall." She observed defendant grab Nunez by his neck and use his other hand to grab Nunez's arm. She stated that when Nunez put his hand out, defendant "threw him on the ground" and stood over him yelling obscenities and telling Nunez he should not "talk to the ladies like that." According to Barber-Johnson, defendant then stated they "shouldn't have any issues out of [Nunez] anymore."

Barber-Johnson denied observing any concerning or threatening behaviors from Nunez earlier that day, although she recalled there was a "mini-scuffle" involving Nunez and another resident at the beginning of her shift. Apparently, the other resident had punched Nunez in the chest because Nunez was being loud. Regarding the incident involving defendant and Nunez, she recalled that she "just watched because [she] was . . . in disbelief . . . and [they] were not trained on hands[-]on things like this . . . from [her] knowledge, like hands off is hands off." Following the incident, Barber-Johnson went to Nunez's room to check on him and to administer his medication. She testified Nunez complained of pain at the back of his head, which she evaluated and observed a small lump.

Officer Appelmann testified about his response to the 911 call from NeuroRestorative, and stated he was dispatched to investigate an "assault," and

5

upon his arrival, he spoke with the staff, including defendant, and residents to determine why 911 was called. Officer Appelmann's body-worn camera from that day was submitted in evidence and a scene played for the jury depicting his first interaction with Nunez.[1] In the video, Nunez tells Officer Appelmann he is "hungry," "need[s] to eat something," and "[his] whole body hurts." Officer Appelmann testified that "prior to [his] arrival and prior to the call, . . . [Nunez] and [defendant] had gotten into an altercation . . . and that [defendant] had grabbed [Nunez] and assaulted him." On redirect, Officer Appelmann was asked whether he realized a caretaker had committed the "assault," to which he replied "yes."

Albert Cook, an emergency medical technician, arrived at the facility and treated Nunez. He testified he did not find out the "assault [was] from one of the caretakers that worked there" until after he was subpoenaed. In response to a question posed by defendant's counsel whether "it matter[ed] who [Nunez] was assaulted by," and whether his interactions with Nunez would have differed if Cook had known "who assaulted [Nunez]," Cook testified, "[i]t doesn't matter who did what to who[m]. [His] patient care wouldn't have changed."

_____

[1] This video is not included in the appellate record.

A-1019-23

Defendant testified Nunez was his "buddy," and he would take Nunez to get cigarettes and lottery tickets and would play games with him. He described that on the day in question, Nunez approached him while he was chatting with his co-workers. Defendant put his hand out to prevent Nunez from getting too close, and then Nunez stumbled and "popped [him] twice in the face." Nunez continued to swing at defendant, and defendant put his hand on Nunez's chest and pressed him to the ground. Defendant next described how he asked his co-workers to call a supervisor and then he and Nunez "hugged each other" before defendant redirected Nunez to his room. He denied putting his hands on Nunez's neck, tossing him to the ground, or verbally assaulting him. Regarding NeuroRestorative's "hands-off" policy, defendant admitted he was unaware of the policy.

At the conclusion of the evidence, a jury acquitted defendant of aggravated assault causing significant bodily injury but found him guilty of the third-degree aggravated assault charge. As noted, the court sentenced defendant to a three-year term of probation and ordered him to complete an anger management program.

On appeal, defendant raises the following points for our consideration:

7

POINT I

THE RESPONDING OFFICER'S REPEATED TESTIMONY THAT [DEFENDANT] COMMITTED THE CRIME OF ASSAULT WAS INADMISSIBLE AND DENIED [DEFENDANT] A FAIR TRIAL.

POINT II

THE STATE CONFUSED THE JURY BY FOCUSING ON [DEFENDANT]'S VIOLATION OF THE FACILITY'S "HANDS-OFF" POLICY. THIS IRRELEVANT AND PREJUDICIAL TESTIMONY, WHICH THE PROSECUTOR EMPHASIZED IN OPENING AND CLOSING [STATEMENTS], LESSENED THE STATE'S BURDEN OF PROOF AND DENIED [DEFENDANT] A FAIR TRIAL.

POINT III

THE CUMULATIVE IMPACT OF THESE ERRORS DENIED [DEFENDANT] A FAIR TRIAL.

When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, we may nonetheless consider the issue if it meets the plain error standard of Rule 2:10-2. State v. Clark, 251 N.J. 266, 286-287 (2022); State v. Singh, 245 N.J. 1, 13 (2021); State v. Gore, 205 N.J. 363, 382-83 (2011). The plain error standard requires a determination of: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v.

8

Dunbrack, 245 N.J. 531, 544 (2021) (internal citation omitted) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)). "The mere possibility of an unjust result is not enough." Funderburg, 225 N.J. at 79. "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.E.P., 243 N.J. 362, 389-90 (2020) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)); see also Clark, 251 N.J. at 287; State v. Alexander, 233 N.J. 132, 142 (2018). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" Clark, 251 N.J. at 287 (internal quotation marks omitted) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

"Plain error is a high bar . . . ." State v. Santamaria, 236 N.J. 390, 404 (2019). "The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" Ibid. (quoting State v. Bueso, 225 N.J. 193, 203 (2016)).

On appeal, defendant argues several trial errors have resulted in his denial of a fair trial, including the repeated reference by Officer Appelmann, who testified for the State that defendant had "assaulted" the victim; the State's focus

at trial on proving defendant violated the facilities' "hands-off" policy and work place rules by touching Nunez; and the State's references to defendant's violation of the "hands-off" policy in its opening and closing statements. Defendant asserts several errors related to the jury instructions, none of which were raised below. As a result, we review these arguments under the plain error standard. R. 2:10-2. We address these arguments seriatum.

We reject defendant's first argument Officer Appelmann "repeatedly offered his opinion that [defendant] had done the very thing he was charged with: committing a criminal assault," in violation of N.J.R.E. 701 and 702, and "police witnesses are not permitted to offer an opinion that the defendant is guilty of the crime charged." Relying primarily on our Supreme Court's holding in State v. McLean, 205 N.J. 438 (2011), defendant urges us to conclude Officer Appelmann's testimony and use of the word "assault" was "clearly capable of producing an unjust result and requires reversal of [his] conviction."

In McLean, the Court considered the issue whether a police officer, testifying as a lay witness, who observed the defendant engage in behavior the officer believed was a narcotics transaction, should be permitted to testify about his belief the defendant was engaged in the sale of narcotics. 205 N.J. at 443. There, after eliciting testimony from the officer about his training, education

and experience, the prosecutor asked him if he suspected defendant was engaged in a hand-to-hand drug transaction, to which defense counsel objected. Id. at 446. The prosecutor argued that under N.J.R.E. 701, which governs lay opinion testimony, the officer should be permitted to testify about his belief that he had witnessed defendant engaged in a drug transaction. Ibid. The Court held the officer's testimony, "because it was elicited by a question that referred to the officer's training, education and experience, in actuality called for an impermissible expert opinion." Id. at 463. And, to the extent that it might have been offered as a lay opinion, it was impermissible because it expressed a belief in defendant's guilt and presumed to opine on matters that were not beyond the jury's understanding. Ibid.

N.J.R.E. 701 states:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.

In support of his argument, defendant refers to three instances in which the word "assault" was mentioned in Officer Appelmann's testimony. More

11

particularly, the following colloquy is cited in defendant's brief in support of his arguments:

> [OFFICER APPELMANN]: We were called for . . . I believe, an assault that had happened there.
>
>    . . . .
>
> [OFFICER APPELMANN]: I believe at that point I called my sergeant that they should come to the scene.
>
> [THE STATE]: And why did you do that?
>
> [OFFICER APPELMANN]: So[,] if there is a level of criminality that we might need some help and clarity on, him being the sergeant, he would contact the assistant prosecutor at the time to talk to them to figure out the steps taken next for whatever we had going on.
>
>    . . . .
>
> [OFFICER APPELMANN]: I learned that prior to our arrival and prior to the call, the group was talking, the people working there and the people inside, the residents. [Nunez] and [defendant] had gotten into an altercation during that event, and that he had grabbed the victim and assaulted him.
>
>    . . . .
>
> [THE STATE]: And was there at some point where you realized that this was a staff member who assaulted [Nunez]?
>
> [OFFICER APPELMANN]: Yes, ma'am.

12

[THE STATE]:  And at that point, did you call a supervisor?

[OFFICER APPELMANN]:  Yes, ma'am.

[THE STATE]:  Why?

[OFFICER APPELMANN]:  So, not knowing the degree of the crime but knowing it was a crime, I figured that I needed to get my supervisor out there. One, because you have to worry about scene safety between, you know, both parties.  You want to make sure they are both safe from each other.  And then also they have to make the ultimate decision sometimes when they are in charge.  And because he's in charge, he has to come out.

[THE STATE]:  So, it wasn't that you didn't know it was a crime?

[OFFICER APPELMANN]:  Uh-huh.

THE COURT:  You have to say yes or no.

[OFFICER APPELMANN]:  Yes, ma'am.  Yes, ma'am.

        . . . .

[THE STATE]:  And a decision was made what crime [defendant] should be charged with for attacking [Nunez]?

[OFFICER APPELMANN]:  Yes, ma'am

[(Emphases omitted).]

13

We reject defendant's contention Officer Appelmann's testimony and use of the word "assault" in responding to the State's questioning constitutes improper lay opinion testimony under N.J.R.E. 701. Contrary to defendant's contention, Officer Appelmann did not give an "inadmissible opinion that [defendant] committed assault." For N.J.R.E. 701 to apply, the testimony must be offered "in the form of opinions." And, there is no bar to an officer's factual testimony setting forth what he or she perceived through one or more of their senses. McLean, 205 N.J. at 460.

In each instance cited by defendant, Officer Appelmann's use of the word "assault" was not made in the form of an opinion and not offered to express his view or opinion that defendant had committed the crime of aggravated assault, as charged. Rather, in each instance, Officer Appelmann's testimony consisted of factual information provided to him during his investigation. When asked why he was on the scene, Officer Appelmann responded "[w]e were called for . . . I believe, an assault that had happened there." The second instance occurred during direct examination when he was asked what he learned about Nunez's injury, and he replied, "I learned that prior to our arrival and prior to the call, . . . [Nunez] and [defendant] had gotten into an altercation during that event, and that he had grabbed [Nunez] and assaulted him." As to the third instance cited

by defendant, Officer Appelmann responded, "Yes, ma'am," to a question posed by the State which asked "was there at some point where you realized that this was a staff member who assaulted [Nunez]?" We do not countenance that his response in the affirmative to a question that included the word "assault" constituted an expression of an opinion as to defendant's guilt.

In other words, the mere use of the word "assault" does not constitute opinion testimony and nowhere did Officer Appelmann opine on the ultimate question of defendant's guilt of the crime of third-degree aggravated assault or presume to give an opinion on matters that were not beyond the understanding of the jury. Thus, defendant's reliance on the holding in McLean is misplaced and Officer Appelmann's testimony was permissible.

Applying the plain error standard, we are not persuaded Officer Appelmann's testimony was capable of producing an unjust result given the overwhelming evidence of defendant's guilt, which was based, at least in part, on the eyewitness testimony of his co-workers. Barber-Johnson gave a compelling, emotional eyewitness account of defendant's actions in subduing Nunez by "pin[ning] him and chok[ing] him up against the wall." Officer Appelmann and Cook echoed they had responded to NeuroRestorative based on

a call that there had been an assault. Both of their testimonies were rationally based on their perception of the events as recounted to them by staff.

We further observe no basis to support defendant's second point "the State's repeated conflation of a policy violation with criminal culpability unfairly suggested to jurors that they could convict [defendant] of assault by finding he violated NeuroRestorative's policies." Defendant testified he did not know about the policy and Purnell agreed that he did not receive the mandated training because of COVID-19, although it was clear he received and signed both the code of conduct, which included the hands-off policy, and a copy of the patients' rights. The State maintains the jury also heard from Purnell that defendant did not receive de-escalation training, therefore, the testimony and evidence he violated company policy did not prejudice him. Again, defendant made no objection to any of the questions posed by the State regarding NeuroRestorative's policy, thus, we review this argument under the plain error standard.

Under N.J.R.E. 401, evidence is relevant if it tends "to prove or disprove any fact of consequence to the determination of the action," and "the test for relevance is broad and favors admissibility." State v. G.E.P., 458 N.J. Super. 436, 454-55 (App. Div. 2019) (citing State v. Deatore, 70 N.J. 100, 116 (1976)).

16

Moreover, N.J.R.E. 403 only requires exclusion of relevant evidence, "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." State v. Williams, 240 N.J. 225, 237-38 (2019) (citing N.J.R.E. 403).

Reviewing this evidence, we are satisfied the State's query into NeuroRestorative's hands-off policy and defendant's knowledge of it at the time of the incident was relevant to disprove his attempts at mitigating and excusing his actions, and to rebut his claims he did not know NeuroRestorative was a hands-off facility. Defendant had steadfastly maintained he did not commit an aggravated assault and stated he was just "doing his job." Thus, testimony about NeuroRestorative's hands-off policy was relevant and would not have been objectionable even if defendant had objected at trial.

Moreover, defendant fails to establish that the probative value of this evidence was substantially outweighed by the risk of undue prejudice, confusion, misleading the jury, undue delay, or cumulative evidence. N.J.R.E. 403. Addressing this issue, we also considered the jury instructions, which provided in part that

> [t]o find . . . defendant guilty of aggravated assault for causing significant bodily injury to another, the State

must prove beyond a reasonable doubt each of the following elements . . . .

One, that the defendant caused significant bodily injury to another. And, two, that the defendant acted purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly . . . .

Second, the actual result must have been within the design or contemplation of the defendant.

The court further instructed the jury on the attempt to cause significant bodily injury stating, "the State must prove beyond a reasonable doubt that the defendant purposely attempted to cause significant bodily injury to another." The court did not instruct jurors regarding NeuroRestorative's hands-off policy. While "[a]ppropriate and proper jury instructions are essential to a fair trial," State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Green, 86 N.J. 281, 287 (1981)), the authority is abundant that jurors are presumed to follow such instructions, State v. Nelson, 155 N.J. 487, 526 (1998) (Handler, J., concurring and dissenting), cert. denied, 525 U.S. 1114 (1999).

Against this backdrop, we are satisfied the jury followed the court's instructions and convicted defendant based on the evidence, not because he violated his employer's hands-off policy. Again, applying the plain error standard, we discern no basis to conclude the testimony concerning

NeuroRestorative's "hands-off" policy was capable of producing an unjust result.

As we have separately addressed and rejected defendant's arguments, we similarly reject his contention that cumulative errors deprived him of a fair trial. Even where a defendant alleges multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014). Here, defendant has not demonstrated any of the court's alleged errors rise to the high bar of plain error, thus, the theory of cumulative error does not apply.

To the extent we have not addressed an argument raised on the appeal, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1019-23