**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2476-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ZAHIR D. MOORE,

    Defendant-Appellant.

_____

Argued November 7, 2024 – Decided December 2, 2024

Before Judges Mawla, Natali, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 20-01-0033.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Hannah Faye Kurt, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Essex County Prosecutor, attorney; Braden Couch, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Appellant Zahir Moore appeals from the March 22, 2023 judgment of conviction entered after a jury found him guilty of the murder of Waleik McCullum and related firearms offenses. We affirm.

I.

We summarize the facts adduced at trial. On September 29, 2019, at approximately 3:50 p.m., McCollum was shot multiple times outside his home in Newark, which he shared with his girlfriend, Khaliyah Prosser, and his father, Richard McCullum.[1] McCullum later died as a result.

Richard and Prosser heard the gunshots. Prosser ran outside but did not see the shooter. When Richard got outside, he saw McCullum on the ground having been shot in the head and chest. Richard tried to rouse McCullum by calling his name and asked him what happened. According to Richard, McCullum responded, and his last words were "[t]hat Pee-wee shot him." Richard did not know the identity of "Pee-wee" at the time. It was undisputed at trial "Pee-wee" was defendant's nickname.

Richard did not report McCullum's statement to police officers who responded to the scene. Richard testified he did not recall speaking with the

---

[1] Because Richard and Waleik McCullum share a common surname, we refer to Richard by his first name. We intend no disrespect by doing so.

A-2476-22

officers at the scene, but a body-worn camera recording played for the jury showed an officer asked Richard what happened, and he responded that he did not know. Richard accompanied his son to the hospital in an ambulance. Richard spoke with officers at the hospital but did not tell them about McCullum's statement. Newark Police detective Shahid Brown, however, testified he left the hospital with the name "Pee-wee" as the possible shooter. McCullum was removed from life support the following day.

Sometime after McCullum's death, Richard, Prosser, and McCullum's mother went to the prosecutor's office to speak with officers. At the meeting, Richard was asked if he knew anything or "was anything said to [him] and [he] told what was told to [him]." According to Richard, "Pee-wee's name was out there" after the meeting.

On October 21, Richard gave a formal recorded statement in which he described McCullum's statement that Pee-wee shot him. Prior to October 21, Richard saw an online news story that defendant had been arrested and charged with McCullum's murder. Richard recognized defendant's face, and particularly his distinctive blue eyes, from seeing defendant together with his son several times.

Christopher Diaz, McCullum's neighbor, testified he was in his first-floor

3

residence when he heard gunshots and looked out his window. Diaz saw "a man holding a gun shooting." He described the shooter as five foot six inches "or probably one or two inches taller," and "[d]ark skinned," wearing a gray "Nike sweat suit." He opened the window and saw the gunman fire two more shots. The gunman was approximately fourteen feet from Diaz. Diaz did not see who the shooter was firing at. Diaz did not speak with police the day of the shooting.

On October 2, Essex County Homicide Task Force detectives Norman Richardson and Suzanne Looges were investigating the shooting. The detectives knocked on Diaz's door, and he initially told them he had not seen anything. After speaking with his wife, Diaz went outside to find the detectives. He approached them and invited them into his home. Once inside, he told the detectives he knew McCullum, witnessed the shooting, and provided a description of the shooter. The detectives did not show him any photographs, videos, or mention any names during this interview. The next day, Diaz went to the police station to provide a statement.

Detective Richardson prepared a photo array for Diaz with six photographs. The detective "filled in the eyes of all of the photos" so defendant's distinctive blue eye color would not stand out. Diaz was shown the photo array by Detective Hervey Cherilien, who was not involved in the investigation and

4

acted as a "double-blind administrator."

Diaz was shown all six photographs. The detective asked Diaz to answer "yes" or "no" to each photograph. Diaz did not initially identify any as the shooter, answering "no" to each. Detective Cherilien asked Diaz if he wanted to see the photographs again and he responded, "[b]etween [two] and [three]." The detective began showing him the entire array a second time, and after seeing photograph three, Diaz picked up the photograph, paused for several seconds, and stated "I think it was [three]. Yeah. I think it was [three]." The detective asked, "[s]o that[ is] a yes or no?" to which Diaz responded "[m]mmmm. (Indiscernible). Yes." The detective did not record Diaz's level of confidence in his identification of photograph three. The detective continued to show Diaz the remaining photographs, and he answered "no" to each. Photograph three was defendant. The identification procedure took approximately five minutes, from 3:41 p.m. to 3:46 p.m. Diaz's entire statement, including the identification procedure, was video recorded and played for the jury.

At trial, Diaz testified photograph three stood out to him the first time he reviewed the array, but he did not pick it out until he saw it a second time because he wanted to be certain. He testified he was "[one hundred] percent certain" photograph three was the shooter. Diaz testified he had seen defendant

5

around the neighborhood a few times before the shooting.

Prosser testified she saw defendant around the neighborhood frequently and she sometimes hung out with defendant and McCullum together. The State introduced photographs of McCullum and defendant sitting on the front stoop of the multi-family residence where McCullum and Diaz lived. The State also introduced various surveillance videos from the day of the shooting and argued the videos showed defendant, wearing a gray sweat suit, walking toward the area of the shooting. Following his arrest, defendant gave a recorded statement in which he stated he was in the area of the incident at the time McCullum was shot.

## II.

Defendant was indicted for first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1); and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1). Prior to trial, defendant moved to exclude Richard's testimony regarding McCullum's alleged dying declaration and for a Wade[2] hearing to determine the admissibility of Diaz's identification.

On October 19, 2020, the court heard oral argument and entered an order

---

[2] United States v. Wade, 388 U.S. 218 (1967).

denying the motions supported by an oral opinion. The court found McCullum's alleged statement was admissible as a dying declaration pursuant to N.J.R.E. 804(b)(2). Specifically, the court determined, based on a totality of the circumstances, the statement was made voluntarily and in good faith while McCullum believed in the imminence of his impending death. The court found Richard's testimony regarding the alleged statement "has all the indicia of reliability" and it would be for the jury to determine whether the statement was made.

With respect to the Wade motion, the court found "the photo array itself [was] certainly not the least bit suggestive here." The court rejected the claim that asking Diaz for a "yes" or "no" response after he selected defendant's photograph was suggestive. It noted the array was presented by "a blind detective who . . . did[ not] know who the . . . defendant was in the photograph. So, there would[ not] be an ability for the person to somehow even inadvertently suggest one photo over another." The court found "the detective certainly was[ not] in any way suggesting . . . Diaz identify a certain photo or not."

Following a jury trial, defendant was convicted on all counts. After an appropriate merger, the court sentenced defendant to thirty-five years with a thirty-year period of parole ineligibility pursuant to N.J.S.A. 2C:11-3(b)(1),

7

subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, for first-degree murder. The court imposed a concurrent sentence of five years with a forty-two-month period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), for unlawful possession of a handgun.

The court found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (the risk the defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (the extent of the defendant's prior criminal history); and nine, N.J.S.A. 2C:44-1(a)(9) (the need for deterring the defendant and others). The court found mitigating factors seven, N.J.S.A. 2C:44-1(b)(7) (the defendant has no history of prior delinquency or criminal activity); and fourteen, N.J.S.A. 2C:44-1(b)(14) (the defendant was under twenty-six years of age at the time on the offense). The court found the aggravating factors preponderated over the mitigating factors.

On appeal, defendant raises the following points for our consideration.

POINT I:

THE COURT ERRED IN DENYING A WADE HEARING AND IN ALLOWING THE WITNESS TO PROVIDE A CONFIDENCE STATEMENT AT TRIAL.

A. The Court Erred in Denying A Wade Hearing Because The Defense Presented Some Evidence of Suggestiveness.

B. It Was Error to Permit the Witness to Testify About his Confidence When Police Failed to Take a Confidence Statement During the Identification Procedure.

POINT II:

THE COURT ERRED IN ADMITTING THE HIGHLY UNRELIABLE ALLEGED DYING DECLARATION. ALTERNATIVELY, THE COURT ERRED IN FAILING TO INSTRUCT THE JURY ON THE IDENTIFICATION CONTAINED IN THE DYING DECLARATION.

A. The Alleged Dying Declaration was too Unreliable to be Admissible.

B. The Failure to Instruct the Jury on How to Assess the Alleged Dying Declaration Requires Reversal.

POINT III:

THE COURT ERRED IN ADMITTING IMPLIED HEARSAY FROM NON-TESTIFYING WITNESSES THAT IMPLICATED DEFENDANT.

POINT IV:

THE PROSECUTOR'S IMPROPER BURDEN-SHIFTING AND NAME-CALLING IN SUMMATION REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT V:

EVEN IF ANY OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT VI:

THE GUN POSSESSION CONVICTION MUST BE REVERSED BECAUSE THE COURT FAILED TO INSTRUCT THE JURY ON THE THIRD ELEMENT OF THE OFFENSE.

POINT VII:

THE COURT ERRED BY FAILING TO PROVIDE ANY EXPLANATION FOR THE AGGRAVATING FACTORS IT FOUND, RENDERING DEFENDANT'S SENTENCE EXCESSIVE.

III.

We are not persuaded by defendant's argument that the court erred in denying his motion for a Wade hearing. The denial of a Wade hearing is reviewed for abuse of discretion. State v. Ortiz, 203 N.J. Super. 518, 522 (App. Div. 1985). We uphold a trial judge's admission of an out-of-court identification if "'the findings made could reasonably have been reached on sufficient credible evidence present in the record.'" State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

A-2476-22

"[T]o obtain a pretrial hearing, a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification. . . . That evidence, in general, must be tied to a system—and not an estimator—variable." State v. Henderson, 208 N.J. 208, 288-89 (2011) (citations omitted). System variables are factors within the control of the criminal justice system.[3] Id. at 247. Estimator variables, in contrast, "are factors related to the witness, the perpetrator, or the event itself–like distance, lighting, or stress–over which the legal system has no control." Ibid.

The court correctly determined defendant did not proffer any evidence of suggestiveness in the identification procedure. His claim that the detective provided Diaz with successive views of the same person that affected the reliability of a later identification is not convincing. Diaz viewed the photographs twice over the course of five minutes and identified defendant. Viewing the same photographs in the same order a few minutes apart is not the type of successive viewing that could affect the reliability of an identification. Moreover, there was no later identification in this case. The entire identification

---

[3] System variables include, for example: (1) blind administration; (2) pre-identification instructions; (3) lineup construction; (4) avoiding feedback and recording confidence; (5) recording confidence; (6) multiple viewings; (7) show up identifications; (8) influence of private actors; and (9) other identifications made. Id. at 289-90.

11

process was completed in one short session.

We are likewise unconvinced by defendant's claim that the detective engaged in suggestive conduct by asking Diaz to answer "yes" or "no" to each photograph. For one thing, as the court noted, the detective was a blind administrator and did not know which photograph depicted a suspect in the case. In addition, the detective asked Diaz the same neutral question for each photograph both times through the array. There was nothing suggestive about the procedure. The court correctly determined defendant was not entitled to a Wade hearing.

IV.

The court did not misapply its discretion by admitting McCullum's alleged dying declaration. We defer to a trial court's evidentiary rulings unless the record reveals the trial court abused its discretion. State v. Garcia, 245 N.J. 412, 430 (2021). Deference is rooted in understanding that "'the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins., 202 N.J. 369, 383-84 (2010)). Under this standard, to reverse a court's evidentiary ruling, the court "must be convinced that 'the trial court's ruling is so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting

12

State v. J.A.C., 210 N.J. 281, 295 (2012)); see also Garcia, 245 N.J. at 430.

Pursuant to N.J.R.E. 804(b)(2), a dying declaration is not excluded by the hearsay rule. The Rule provides, "[i]n a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." To satisfy the "belief of imminent death" requirement, the proponent of a dying declaration must establish the declarant had "'a settled hopeless expectation that death is near at hand, and what is said must have been spoken in the hush of its impending presence.'" State v. Williamson, 246 N.J. 185, 201 (2021) (quoting Shepard v. United States, 290 U.S. 96, 100 (1933)). A declarant's "'state of mind'" is the "'decisive'" factor in the analysis. Ibid. (quoting Shepard, 290 U.S. at 100).

Of course, even if evidence could fall under an applicable exception, the court in its role as gatekeeper must "ensure that evidence admitted at trial is sufficiently reliable so that it may be of use to the finder of fact who will draw the ultimate conclusions of guilt or innocence." State v. Michaels, 136 N.J. 299, 316 (1994); see N.J.R.E. 403(a) (evidence "may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury").

A-2476-22

Defendant does not dispute the court's determination that McCullum's statement, if made, falls squarely within the definition of a dying declaration. Plainly, it does. According to Richard, McCullum identified the person who shot him as he was dying in his father's arms. Defendant contends Richard's testimony about the statement was too unreliable to be admissible. Specifically, he argues there were other people near McCullum who did not report hearing the statement, the statement was not recorded on police body-camera video, and Richard did not immediately report the statement to law enforcement. We are not convinced.

As the court found, the fact that other people did not hear the statement made during the chaotic minutes after McCullum was shot did not mean it was not made. The court rejected the argument that the statement was not captured on police body-camera video because the police arrived after the statement was made. The court also rejected the argument that Richard's testimony was unreliable because he did not immediately disclose the statement. It noted Richard told police after "he . . . had some time to gather himself, to think back, reflect back as to . . . that horrible incident and what his son said to him."

Considering the totality of the circumstances, the court found "there[ is] a strong indicium of reliability . . . and that this was not fabricated on [Richard's]

part." We do not perceive any basis to disturb the court's decision to admit McCullum's alleged dying declaration. The court, in its role as gatekeeper, properly discharged its obligation to "ensure that evidence admitted at trial is sufficiently reliable." Michaels, 136 N.J. at 316.

V.

Defendant argues his conviction must be reversed because Diaz was permitted, over counsel's objection, to testify about his level of confidence in identifying defendant even though his level of confidence was not recorded soon after the identification procedure. Alternatively, defendant argues we should remand for a Wade hearing to determine whether Diaz received confirmatory feedback after the identification that distorted his level of confidence.

"It is . . . critical for law enforcement to record a witness' full statement of confidence when an identification is first made—before any possible feedback." State v. Anthony, 237 N.J. 213, 226 (2019). Failure to do so, however, does not require exclusion of the identification. If an eyewitness's level of "confidence was not properly recorded soon after an identification procedure, and evidence revealed that the witness received confirmatory feedback from the police or a co-witness, the court can bar potentially distorted and unduly prejudicial statements about the witness' level of confidence from

15

being introduced at trial" consistent with N.J.R.E. 403. Henderson, 208 N.J. at 298.

There is no dispute Diaz's level of confidence was not recorded, and the court did not conduct a hearing to determine whether he received confirmatory feedback after the identification. Over counsel's objection, however, Diaz was permitted to testify he was "[one hundred] percent certain" in his identification, a fact repeated by the State in its closing argument. We conclude it was error to permit this testimony, but the error was harmless.

We apply the harmless error rule when, as here, a specified error was brought to the trial judge's attention. State v. G.E.P., 243 N.J. 362, 389 (2020). We must determine whether there was "'some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached.'" State v. Lazo, 209 N.J. 9, 26 (2012) (first alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)). In doing so, we must independently assess the quality of the evidence of defendant's guilt. State v. Sterling, 215 N.J. 65, 102 (2013).

That is so because:

> Trials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as

devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. "A defendant is entitled to a fair trial but not a perfect one."

[R.B., 183 N.J. at 333-34 (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).]

We conclude the error was harmless based on the totality of the circumstances. The State's case was strong based on McCullum's dying declaration, surveillance video the State alleged showed defendant walking toward the area of the shooting, and defendant's statement that placed him in the area. To be sure, Diaz's identification was an important element of the State's case. The jury, however, viewed the video of the identification procedure and was able to see and hear for themselves Diaz's reaction to and selection of defendant's photo. The jury was able to make their own assessment of Diaz's level of confidence based on the evidence presented. Considering the strength of the State's case and the fact that the jury was able to see and hear Diaz's identification of defendant, we are satisfied there is no "reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached." Lazo, 209 N.J. at 26.

VI.

Defendant's claim that he is entitled to a new trial because the court permitted the introduction of implied hearsay from non-testifying witnesses is not persuasive. Our federal and state constitutions both guarantee criminal defendants the right to confront witnesses and to cross-examine accusers. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; see also Crawford v. Washington, 541 U.S. 36, 43 (2004); State v. Branch, 182 N.J. 338, 348 (2005). "A defendant's right to confrontation is exercised through cross-examination, which is recognized as the most effective means of testing the State's evidence and ensuring its reliability." State v. Guenther, 181 N.J. 129, 147 (2004).

The admission of hearsay generally violates an accused's confrontation rights. Crawford, 541 U.S. at 49-51. However, "[t]he Confrontation Clause does not condemn all hearsay." Branch, 182 N.J. at 349. "It is well settled that the hearsay rule is not violated when a police officer explains the reason [they] approached a suspect or went to the scene of the crime by stating that [they] did so 'upon information received.'" State v. Bankston, 63 N.J. 263, 268 (1973) (quoting McCormick on Evidence § 248 (Cleary ed., 2d ed. 1972)). That explanation is admissible to demonstrate "the officer was not acting in an arbitrary manner or to explain [their] subsequent conduct." Ibid. But, when the

18

officer repeats "what some other person told [them] concerning a crime by the accused," the hearsay rule is violated, and the admission of that testimony violates the Confrontation Clause.  Id. at 268-69.

An officer may not "state[] or suggest[] that some other person provided information that linked the defendant to the crime."  Branch, 182 N.J. at 351 (citing Bankston, 63 N.J. at 268-69).  When a law enforcement witness implies that a non-testifying witness "possesses superior knowledge, outside the record, that incriminates the defendant," the Confrontation Clause is violated.  Ibid.; see also State v. Kemp, 195 N.J. 136, 155 (2008) (explaining this limitation is meant to avoid the implication that the officer's testimony is "worthy of greater weight").

In Branch, the Court "disapprove[d] of a police officer testifying that he placed a defendant's picture in a photographic array 'upon information received,'" because "[e]ven such seemingly neutral language, by inference, has the capacity to sweep in inadmissible hearsay.  It implies that the police officer has information suggestive of the defendant's guilt from some unknown source."  182 N.J. at 352.  Moreover, "[w]hy the officer placed the defendant's photograph in the array is of no relevance to the identification process and is highly prejudicial."  Ibid.

Defendant contends the court erred by permitting Detective Brown to testify that "after leaving the hospital" he had "a nickname" which was "Pee-wee." Counsel did not object to this testimony, and we therefore review for plain error.

When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, it may nonetheless be considered by the appellate court if it meets the plain error standard of Rule 2:10-2. State v. Singh, 245 N.J. 1, 13 (2021); State v. Gore, 205 N.J. 363, 383 (2011). Rule 2:10-2 prescribes that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result[.]" "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). The plain error standard requires a determination of: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' Rule 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached[.]'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (omission in original) (quoting Funderburg, 225 N.J. at 79).

Considering the totality of the circumstances, Detective Brown's testimony that he left the hospital with the nickname "Pee-wee" was not capable

of producing an unjust result. The jury already heard Richard's testimony regarding McCullum's dying declaration and was aware of the claim that McCullum identified "Pee-wee" as the shooter. Detective Brown's testimony did not convey to the jury anything they had not already heard.

Defendant next contends Detective Brown testified, on cross examination, he learned of the nickname from McCullum's "family members," and possibly not from Richard. This argument is precluded by the doctrine of invited error. Under the "invited error" doctrine, "errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). The only reason Detective Brown testified he may have obtained the nickname from a family member other than Richard was because defense counsel made the strategic decision to elicit that testimony potentially to undermine Richard's testimony. Having invited the allegedly inadmissible testimony, defendant has no basis to object now.

Defendant next contends the court erred by permitting, over counsel's objection, Detective Richardson to testify that he met with Detective Brown who provided him with defendant's name as a potential suspect, as well as his nickname and physical description. Detective Richardson also testified he used

the physical description to assemble the photo array for Diaz.

We conclude it was proper to permit Detective Richardson to testify about what Detective Brown told him because they were both testifying witnesses at trial. In addition, Richard testified at trial that he was the source of McCullum's statement that "Pee-wee" was the shooter. Based on all the evidence in the record, Detective Richardson's testimony did not "imply to the jury that" the detectives relied on a non-testifying witness who "possesse[d] superior knowledge, outside the record, that incriminate[d] the defendant." See Branch, 182 N.J. at 351.

Even if it was error to permit the testimony, the error was harmless. Detective Richardson conveyed to the jury what they already knew–Richard contended McCullum identified "Pee-wee" as the shooter. The jury heard that from Richard himself when he testified prior to Detective Richardson. The jury also heard directly from Detective Brown when he testified that he left the hospital after speaking to McCullum's family with the identification of "Pee-wee" as the possible shooter. Under all the circumstances of this case, Detective Richardson's testimony did not give rise to a reasonable doubt as to whether defendant was denied a fair trial and a fair decision on the merits.

VII.

Defendant's claim that he is entitled to a new trial based on the State's improper burden shifting and name calling in summation lacks merit. Defendant contends the prosecutor improperly shifted the burden of proof by asking the jury "[w]here was the got you moment[,]" immediately after noting "[t]he credibility and the testimony was vigorously challenged by [the] defense." Counsel objected to this statement, so we review for harmless error.

Considerable leeway is afforded to prosecutors in presenting their arguments at trial "as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted." State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000). "'Generally, remarks by a prosecutor, made in response to remarks by opposing counsel are harmless . . . .'" Id. at 284-85 (quoting State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993)).

The prosecutor's comment did not improperly shift the burden of proof to the defense. The prosecutor was arguing, from the State's perspective, the defense's effort to impugn the credibility of the State's witnesses fell flat. It was in no way improper for the prosecutor to do that. We do not perceive any error,

A-2476-22

much less reversible error.

Defendant next argues the State improperly shifted the burden of proof during the prosecutor's discussion of the defense's efforts to undermine the credibility of Prosser, by asking "[w]hy didn't you [not] ask that follow[ up] question; hey, who at [the building] did you talk to?  Maybe because you do[ not] want the right answer that you[ are] going . . . to get."  Counsel did not object to this remark, so we review for plain error.

Generally, when the defendant fails to object to the prosecutor's comments at trial, the allegedly "improper remarks . . . will not be deemed prejudicial." State v. Timmendequas, 161 N.J. 515, 576 (1999), cert. denied, 534 U.S. 858 (2001).  Here, the prosecutor was again commenting on the defense's attempt to attack Prosser's credibility.  It was appropriate for the prosecutor to point out what the State believed to be deficiencies in that effort.  We discern no error.

Finally, defendant contends the prosecutor engaged in an inappropriate personal attack.  Specifically, while displaying a photograph of McCullum sitting on the porch of his home with defendant standing behind him, the prosecutor described it as "[j]ust an innocent photo, capturing the last happy moments of a young man's life, not knowing the devil behind him, what[ is] to come."  Counsel did not object to this comment, and we therefore review for

24

plain error.

A prosecutor may not call the defendant a "liar" or employ any derogatory epithets against the defendant. State v. Pennington, 119 N.J. 547, 577 (1990). However, a finding that a prosecutor has made an improper statement "does not end a reviewing court's inquiry; in order to merit reversal, the misconduct must have deprived the defendant of a fair trial." Hawk, 327 N.J. Super. at 281.

Prosecutorial misconduct is not a basis for reversal unless the conduct was so egregious that it deprived the defendant of a fair trial. State v. DiFrisco, 137 N.J. 434, 474 (1994), cert. denied, 516 U.S. 1129 (1996). The prosecutor's conduct must have been so egregious that it "substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Timmendequas, 161 N.J. at 575.

A "single metaphor" or instance of "name-calling" will not rise to the level of reversible misconduct if it does not implicate the defendant's right to a fair trial. State v. Wakefield, 190 N.J. 397, 467 (2007) (declining to reverse where prosecutor likened defendant to "the wolf taking the lives of the two helpless sheep"). Overall, a court "must assess the prosecutor's comments in the context of the entire trial record," State v. Nelson, 173 N.J. 417, 472 (2002), including whether the trial was lengthy, and the prosecutor's remarks were short or

25

"errant." State v. Engel, 249 N.J. Super. 336, 382 (App. Div. 1991).

We are satisfied the prosecutor's single reference to "the devil behind him" was not so egregious that it "substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Timmendequas, 161 N.J. at 575. The prosecutor did not expound on the reference in any way and did not engage in any other allegedly improper name calling during the trial. This type of short, errant remark in the course of a multi-day trial, although ill-advised, was not so egregious that it deprived defendant of a fair trial.

## VIII.

Defendant contends the court erred by not instructing the jury that McCullum's dying declaration was based on his identification of defendant and including that fact when it instructed the jury on out-of-court identification. The court read the Model Criminal Jury Charge – Out of Court Identification Only in its entirety in connection with Diaz's out of court identification. Defendant contends the court was required to also read the charge in connection with McCullum's identification of defendant as the person who shot him. Counsel did not object to the charge.

It is axiomatic that "'[a]ppropriate and proper jury instructions are

A-2476-22

essential to a fair trial.'" State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Green, 86 N.J. 281, 287 (1981)). "Jury charges 'must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them.'" Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 256 (2015) (quoting Velazquez v. Portadin, 163 N.J. 677, 688 (2000)).

In the context of a claim of error in a jury instruction raised for the first time on appeal, "'plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."'" State v. Singleton, 211 N.J. 157, 182-83 (2012) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Reviewing courts must read the charge "as a whole" to determine its overall effect rather than reading the challenged portions in isolation. State v. Garrison, 228 N.J. 182, 201 (2017).

Here, the court properly instructed the jury on how they should evaluate an out of court identification. Although the instruction was directed at Diaz's identification of defendant, the substance of the instruction was identical to the

charge defendant contends the court should have given in connection with McCullum's identification. Read as a whole, the instruction plainly spelled out how the jury should apply the legal principles to the facts relating to any out of court identification. We conclude, therefore, the instruction provided did not have the potential to "prejudicially affect[] the substantial rights of the defendant," and did not possess "a clear capacity to bring about an unjust result." Singleton, 211 N.J. at 182-83.

Defendant's argument that the court did not charge the jury on the third element of the offense of unlawful possession of a handgun, lacks sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2). The court instructed the jury that the State must prove "beyond a reasonable doubt . . . ; that the [d]efendant did not have a permit to possess such a weapon." Counsel did not object to the charge. The jury instruction neither produced an unjust result nor prejudiced defendant's substantial rights.

IX.

We are unpersuaded by defendant's claim that he is entitled to a new trial based on cumulative error. "'A defendant is entitled to a fair trial but not a perfect one.'" State v. Weaver, 219 N.J. 131, 155 (App. Div. 2014) (quoting Wakefield, 190 N.J. at 537). However, "[w]hen legal errors cumulatively render

28

a trial unfair, the Constitution requires a new trial." Ibid. "In some circumstances, it is difficult to identify a single error that deprives defendant of a fair trial." Id. at 160. "'[W]here any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that [the] defendant was not accorded a fair trial, it becomes the duty of this court to reverse.'" Id. at 155 (first alteration in original) (quoting State v. Orecchio, 16 N.J. 125, 134 (1954)).

The State's case was strong and, to the extent there were errors made during the lengthy trial, they were harmless. We are convinced defendant was accorded a fair trial and there is no basis to reverse his conviction based on cumulative error.

## X.

We are not persuaded by defendant's claim that the court did not provide an adequate explanation for the aggravating factors it applied at sentencing. We review a sentence imposed by a trial court under an abuse of discretion standard. State v. Jones, 232 N.J. 308, 318 (2018). In doing so, we consider whether: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were . . . 'based on competent evidence in the record;' [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial

29

conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). To facilitate appellate review, the court must "'state [the] reasons for imposing such sentence[,] including . . . the factual basis supporting a finding of particular aggravating [and] mitigating factors affecting sentence.'" State v. Fuentes, 217 N.J. 57, 73 (2012) (quoting R. 3:21-4(g)) (omissions in original).

The court explained it found aggravating factor three based on defendant's escalating record of unlawful conduct as a juvenile, including a violation of probation. It gave limited weight to aggravating factor six based on his juvenile record. The court also found aggravating factor nine based on the need to deter "this type of seemingly senseless violence." It applied mitigating factor seven in spite of defendant's juvenile record, because this was his first indictable conviction. The court also applied mitigating factor fourteen because defendant was under the age of twenty-six at the time of the offense.

We are satisfied the court adequately explained the basis for its findings of aggravating and mitigating factors. Even though the court found the aggravating factors preponderated over the mitigating factors, it sentenced defendant to thirty-five years for first-degree murder, only slightly above the mandatory minimum sentence of thirty years and well below the midpoint of the

sentencing range. The court also rejected the State's request that it impose a consecutive sentence for unlawful possession of a handgun and imposed the minimum permissible concurrent sentence for that offense. The sentence imposed was not excessive, does not shock the judicial conscience, and there is no reason for us to disturb it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31

A-2476-22